# EXHIBIT 12

**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF COLUMBIA


              CIVIL ACTION NO. 23-cv-01270-TSC


SAMANTHA RYALS,
           Plaintiff,
vs.
UNITED STATES OF AMERICA,
VIOLETA GROUNDS MANAGEMENT
COMPANY, Inc. and THE DAVEY TREE
EXPERT COMPANY,

           Defendants.


-------------------------------------/


DEPOSITION OF:          JOSHUA PIQUETTE
DATE:                   AUGUST 20, 2024
TIME:                   10:01 A.M. - 12:25 P.M.
PLACE:                  VIA REMOTE CONFERENCING




REPORTED BY:            SUSAN BARNARD,
                        PROFESSIONAL COURT STENOGRAPHER
                        NOTARY PUBLIC, STATE OF FLORIDA
```

**Page 2**

```
 1 APPEARANCES:
 2 ROBERT VISCA, ESQ.
   BRODSKY FOTIU-WOJTOWICZ, PLLC
 3 200 Southeast 1st Street
   Suite 400
 4 Miami, Florida 33131
   (305)503-5054
 5 robert@bfwlegal.com
              COUNSEL APPEARING ON BEHALF OF THE PLAINTIFF.
 6
   JOHN J. BARDO, ESQ., Assistant United States Attorney
 7 United States Attorney's Office
   601 D Street, NW
 8 Washington, DC 20530
   Tel: (202) 870-6770
 9 John.Bardo@usdoj.gov
              COUNSEL APPEARING ON BEHALF OF DEFENDANT, USA
10
   WILLIAM CARLOS PARLER, JR., ESQ.
11 THE LAW OFFICES OF WILLIAM C. PARLER, JR., LLC
   311 Gailridge Road
12 Timonium, MD 21093
   Tel: (410) 832-1885
13 W.parler@parlerlaw.com
              COUNSEL APPEARING ON BEHALF OF DEFENDANT, VIOLETA
14
   JOE BOURY, ESQ.
15 LITCHFIELD CAVO, LLP
   303 West Madison, Suite 300
16 Chicago, IL 60606
   Tel: 312.781.6602
17 Boury@Litchfieldcavo.com
              COUNSEL APPEARING ON BEHALF OF DEFENDANT, THE DAVEY
18 TREE EXPERT COMPANY
19 ALSO PRESENT:
20 SHEILA WRIGHT-VIOLETA
21
22
23
24            * * * * * * * *
25
```

**Page 3**

```
 1                   I N D E X
 2
 3 WITNESS:
 4 Joshua Piquette
 5
   DIRECT EXAMINATION                              4
 6 By Mr. Visca
 7
   CROSS EXAMINATION                              77
 8 By Mr. Parler
 9
10
11                   -  -  -
12
              INDEX TO EXHIBITS
13
   PLAINTIFFS'
14
   Exhibit        Description              Page
15
   Comp A         Work Performance Statement    40
16
       B          Answers to Interrogatories    68
17
       C          full production               73
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1 Thereupon,
 2           JOSHUA PIQUETTE,
 3 having been first duly sworn remotely, was examined and
 4 testified as follows:
 5           DIRECT EXAMINATION
 6 BY MR. VISCA:
 7 Q.    Good morning, sir.  Can you please start by
 8 stating your full name and spelling it for the record?
 9 A.    Yes, full name, Joshua Michael Piquette,
10 J-O-S-H-U-A, M-I-C-H-A-E-L, P-I-Q-U-E-T-T-E.
11 Q.    Thank you.  Have you ever given a deposition
12 before today, sir?
13 A.    No, sir.
14 Q.    Okay.  Just to go over a few ground rules that
15 hopefully will make the process move as quickly and
16 smoothly as possible:  First, it is important that you
17 verbalize all your responses, even though we can see
18 each other via Zoom.  You can't answer with a nod of
19 your head or uh-uh or anything like that.  She can't
20 take that down for the record.  I will prompt you for a
21 yes or no if that happens from time to time.
22        It is also important that we don't speak over
23 one another.  That makes the court reporter's life very
24 difficult.  So even if you know where my question is
25 going, just let me completely finish asking the question
```

**5**

1  before you begin to answer.
2  A.    Okay.
3  Q.    I don't want you to guess.  I don't want you to
4  speculate.  I don't want you to make assumptions.  If
5  you know the answer, great.  If not, if you don't know
6  or you don't recall, you are not sure, that is a
7  perfectly fine answer.
8        If you don't understand one of my questions, not
9  quite sure what I am asking you, need me to repeat it,
10 let me know.  I am happy to do so.  Otherwise, if you
11 answer the question, we are going to assume that you've
12 understood the question.
13 A.    Understood.
14 Q.    If you need a break at any time, let us know.  I
15 am happy to accommodate?
16 A.    Okay.  Thank you.  Are you guys --
17       I hear some chatter.  Are you hearing anything?
18 Are you hearing me clear?
19 Q.    I am hearing you clear.
20 A.    Just making sure there is no background noise as
21 far as that issue.
22 Q.    Is there anyone with you today attending this
23 deposition?
24 A.    No.
25 Q.    Do you have any documents with you?

**6**

1  A.    No.
2  Q.    What is the highest level of education you have
3  obtained?
4  A.    High school graduate with honors, completed with
5  diploma and attended community college but no completion
6  of community college.
7  Q.    Where did you attend?
8  A.    Chesapeake, Virginia.  It was the high school,
9  Western Branch High School.
10 Q.    Is that the area you are from?
11 A.    Yeah, I was born in Providence, Rhode Island but
12 lived - raised my whole life - in the Virginia Beach
13 area, in the Chesapeake area.
14 Q.    Besides community college, any other type of
15 vocational school or technical training?
16 A.    No, sir.
17 Q.    Do you currently possess any professional
18 licenses or certifications?
19 A.    Professionally, I am a Chesapeake landscape
20 professional as of 2022.
21 Q.    What did you have to do to obtain that
22 certification?
23 A.    It was a two-week, or excuse me, two-day course
24 in person followed by a test administered via computer.
25 Q.    And what is the purpose of that certification?

**7**

1  What does it allow you to do?
2  A.    Obviously, in the Chesapeake Bay being near
3  here, it allows us a lot of RFP's for contractual work,
4  government and nongovernment.  I've begun a list that is
5  a requirement for management of anybody awarded this
6  work, any set work to have that accreditation.
7  Q.    What do you mean by RFP's?
8  A.    Requests for proposals.
9  Q.    Do you have any other certifications or
10 licenses?
11 A.    Previously, a Virginia-certified horticulturist,
12 but that has since expired.  I am no longer in Virginia.
13 Q.    You said certified horticulturist?
14 A.    Yes, sir.
15 Q.    What does a horticulturist do?
16 A.    Verse and plant ID, horticultural practices,
17 obviously economics, things of that nature.
18 Q.    You said that lapsed or expired?
19 A.    It just expired, no longer in Virginia.  So it
20 wasn't - doesn't meet requirements I need for Maryland
21 or anything else.
22 Q.    What timeframe did you have that particular
23 license or certification?
24 A.    2013.  Sorry.  Just looking at the wall for
25 where the plaque is, 2013.

**8**

1  Q.    When did it expire?
2  A.    I also need to look at the wall.  That is when
3  it expired, 2013.
4  Q.    Were there any other certifications that you
5  previously had that you no longer have?
6  A.    No, sir.
7  Q.    Who is your current employer?
8  A.    The Davey Tree Expert Company.
9  Q.    What is your position at the Davey Tree Expert
10 Company?
11 A.    I am branch manager.
12 Q.    For brevity's sake, I will probably just refer
13 to them as Davey from here on out.
14 A.    We all do, no worries.
15 Q.    How long have you been the branch manager?
16 A.    Six years.
17 Q.    What current branch or location are you at?
18 A.    I run our, what is called, our Washington D.C.
19 and Maryland office, based in Gaithersburg, Maryland.
20 Q.    Have you been in that branch the entire six
21 years?
22 A.    No, sir.
23 Q.    Okay.  Where were you previously?
24 A.    Previously started with our company that I work
25 for that was previously purchased by Davey in April of

9

1  2018.  And I stayed in the role I had obviously
2  maintained, the branch manager role, upon the
3  acquisition as branch manager of our Virginia Beach
4  office previously and then moved north in 2020.
5  **Q.    Okay.  So since 2020, you have been in the D.C.**
6  **area branch?**
7  A.    Correct.
8  **Q.    What are your day-to-day responsibilities as**
9  **branch manager?**
10  A.    From my branch in particular, I oversee 40 to 45
11  people including manager, facilitate sales, manage
12  profit and loss.
13  **Q.    Has that been the same responsibilities since**
14  **2002?**
15  A.    Yes, that's correct.
16  **Q.    Are you an owner of Davey?**
17  A.    I am.  We are an employee/union company, and I
18  am an employee/owner.
19  **Q.    All employees are --**
20  A.    All employees after one year of employment have
21  the ability to be owners.
22  **Q.    Do you know how many current employee owners**
23  **there are?**
24  A.    Yeah, if I can, I think it is around 5,000 to
25  5,500 out of 12,000 employees.

10

1  **Q.    What was the name of the company you worked for**
2  **that was acquired by Davey?**
3  A.    Elizabeth River, Lawn and Landscape.
4  **Q.    How long did you work there?**
5  A.    Two years prior to the acquisition.
6  **Q.    And what did you do for them?**
7  A.    Same role, branch manager of our Virginia Beach
8  office.
9  **Q.    What type of services did they provide?**
10  A.    Landscape maintenance, landscape enhancements
11  and snow removal.
12  **Q.    Commercial and residential?**
13  A.    Commercial, yeah.
14  **Q.    Same thing for Davey?**
15  A.    Yes, sir.
16  **Q.    Do you know when Davey was first born or**
17  **founded?**
18  A.    Yes, 1880.
19  **Q.    Wow.  Where is there current headquarters or**
20  **central office?**
21  A.    Sure, Kent, Ohio.
22  **Q.    K-E-N-T, Ohio?**
23  A.    Yeah.
24  **Q.    How long has that been their headquarters?**
25      MR. BOURY:  Objection.

11

1  A.    To the best of my ability, that should be 1880
2  as well.
3  **Q.    Does the D.C. branch have a central office**
4  **location?**
5  A.    My office, which is 18840 Woodfield Road,
6  Gaithersburg, Maryland.
7  **Q.    Did you get the 1880 address intentionally?**
8  A.    No, this was a Davey-owned building or it is a
9  Davey-owned building, never leased, always was built for
10  the purpose of Davey.  That just worked.
11      MR. BARDO:  Interesting coincidence.
12  **Q.    18840 Woodfield Road, what was the rest of the**
13  **address?**
14  A.    Gaithersburg, Maryland 20879.
15      COURT REPORTER:  Thank you.
16  **Q.    How long have they been in that location?**
17  A.    Again, I don't know if I have the specifics on
18  that, but I know it was around 1989-1990 timeframe.
19  **Q.    Are there any other offices affiliated or**
20  **associated with the D.C. branch?**
21  A.    I mean, they run the Davey umbrella.  They are
22  under -- We have different service lines.  Davey Tree,
23  it's a big operation.  That operate in different service
24  lines.  There are probably honestly between 10 to 12
25  different service line offices in the D.C. Metro area

12

1  for Davey Tree.
2  **Q.    What do you mean by service lines?**
3  A.    Service lines, we are the commercial landscape
4  services line.  There is an environmental consulting
5  service line, a utility, line clearance and RC Tree Care
6  service line.  So the company is made up of four
7  different service lines.
8  **Q.    So within the commercial landscaping service**
9  **line, you said it may be 10 to 12?**
10  A.    No, no, the entire Davey umbrella.  As far as
11  commercial service line, for me, I am the only one in
12  Maryland.  And we have two in Northern Virginia.
13      MR. BOURY:  Josh, no big deal, but let him
14  finish the question before you answer.
15      THE WITNESS:  Yes, sir.
16  **Q.    Is there anyone that you report to directly?**
17  A.    Yes, sir.
18  **Q.    Who is that?**
19  A.    That is Robert Bunch.
20  **Q.    What is his position?**
21  A.    He is Midatlantic Operations Manager.
22  **Q.    Where does he operate out of?**
23  A.    He is actually based in Richmond, Virginia.
24  **Q.    How long have you reported to him?**
25  A.    A year and eight months.

13

1  Q.    Who did you report to prior to Robert Bunch?
2  A.    John Wright.
3  Q.    Can you spell Wright?
4  A.    W-R-I-G-H-T.
5  Q.    He was in that role previously?
6  A.    He was Regional Manager.
7  Q.    How long did you report to him?
8  A.    Four years -- Or excuse me.  Well, sorry.  I
9  technically still report to him now.  It would have been
10 up to January of 2023.  My apologies.
11 Q.    And how many employees directly report to you?
12 A.    40.
13 Q.    What type of positions does that include?
14 A.    I am sorry.  Could you repeat the question?
15 Q.    What type of employee positions does that
16 include in that 40?
17 A.    I have account managers, production managers,
18 crew leaders and landscape technicians that report to
19 me.
20 Q.    What do the crew leaders do?
21 A.    Crew leaders perform services on routes based
22 off material sold or contracts we have sold and manage
23 the crew members, which we call landscape technicians,
24 on the day-to-day operations in the field.
25 Q.    Okay.  Currently, how many crews are there?

14

1  A.    In my office, there is ten crews.
2  Q.    How many individuals per crew?
3  A.    Usually three, no more than four.
4  Q.    Including the crew leader?
5  A.    Correct.
6  Q.    Has that been consistent since 2020?
7  A.    Yes, sir.
8  Q.    Meaning the 2020-2021 timeframe, there was ten
9  crews with three to four people per crew?
10 A.    2020, there was actually -- Excuse me.
11     2021 there was more crews, probably more like 15
12 to 20 crews but the same setup, no more than three to
13 four people per group.
14 Q.    And how are assignments or projects allocated
15 for each crew?
16     How does that work?
17 A.    Based off route density, you know, obviously
18 where we strategically have our work, you know, is where
19 we want our people routed.  It is all based off
20 geography and then man hours associated with jobs.
21     The way we price work is based off man hours
22 needed to do work also in conjunction with the
23 measurements we have taken as far as square footages or
24 linear feet.  So obviously routes are built not only
25 geography but however many hours in a day we can perform

15

1  said work, and then how many hours we hold people to per
2  week.
3  Q.    Are you familiar with Lincoln Park in Washington
4  D.C.?
5  A.    Yes, sir, I am.
6  Q.    So how does the crew assignment work for Lincoln
7  Park currently?
8  A.    So typically --
9     MR. BOURY: Object to form.  Go ahead.  Okay.
10 Just give a second for me to interject.  Do you need the
11 question read back?
12     THE WITNESS: Yes, please.
13 Q.    How are the crews assigned to Lincoln Park?
14 A.    So that would be a three-man route when
15 performed.  It is a three-man route based again off
16 geography associated with the rest of slights in that
17 area.
18 Q.    Is it one specific three-man crew that's
19 assigned to Lincoln Park?
20 A.    Correct.  It was the same crew every week that
21 would, you know, go to Lincoln Park minus callout due to
22 illness, same crew same, same crew.
23 Q.    Would that be the same in the 2020-2021
24 timeframe?
25 A.    Yes, sir.

16

1  Q.    Has it been the same crew over the past four
2  years assigned to Lincoln Park?
3  A.    Same crew leader.  Might have been a different
4  crew member here or there but same crew leader.
5  Q.    Who is the crew leader?
6  A.    Currently?
7     MR. BOURY: Currently.
8  A.    The crew leader --
9  Q.    The crew leader that was assigned since 2020.
10 A.    Michael Evans.
11 Q.    How long has he been with Davey?
12 A.    I cannot answer that.  He was in the Midatlantic
13 region before when I was down south.  I would have to
14 find out, you know.
15 Q.    Do you know what his kind of professional
16 training background is in landscaping?
17 A.    I do know he had, I think it was, 15 years of
18 experience all together, Davey and prior to Davey.  But
19 again, that is to the best of my ability.
20 Q.    Any landscape technicians for this Lincoln Park
21 crew that are currently still in that crew that were
22 there since 2020?
23 A.    No, sir.
24 Q.    Do you know who the landscape technicians were
25 for Lincoln Park in 2020-2021?

JOSHUA PIQUETTE

17

1  A.    Not as of now.  I would have to, you know, do
2  some research.  I have nothing that I can tell you off
3  the top of my head from three years ago that would be
4  able to tell me that answer right now.
5  Q.    **If you want to look that up, what document would**
6  **you look at to ascertain the individuals who worked on**
7  **this crew during this timeframe?**
8  A.    Either our payroll document or time sheets.
9  Q.    **What is included on the time sheets?**
10  A.    Time sheet has our, for us, our week ending
11  dates for fiscal calendar, manager responsibility - as
12  in name of the manager - crew members by name and
13  employee number and hours worked per day on a job.
14  Q.    **So that would indicate incidents where they go**
15  **out to the job to perform services?**
16  A.    Correct.
17  Q.    **Is that what they are called, time sheets?**
18  A.    Time sheets, yes.
19  Q.    **And those would be maintained for all crews**
20  **since 2020?**
21  A.    That is correct.
22  Q.    **So Davey would still have a copy of the time**
23  **sheets for the crew that worked at Lincoln Park since**
24  **2020?**
25  A.    That is correct.

18

1  Q.    **How are they stored or maintained?  Is it**
2  **digital or physical?**
3  A.    They are physical.
4  Q.    **Paper?**
5  A.    We still use paper copies for time sheets.
6  Q.    **Where are they physically stored?  Which**
7  **location?**
8  A.    For that timeframe, they could be in the
9  Northern Virginia office, Norton, Virginia; or they
10  could possibly be here.  And I say that because we moved
11  our federal work from the Northern Virginia office from
12  2020.  We moved to Maryland.
13  Q.    **At the Gaithersburg address, right?**
14  A.    Yes, Gaithersburg, yes.
15  Q.    **Sorry.  You can tell I am not from there.**
16  A.    No problem.
17  Q.    **Besides some time sheets, are there any other**
18  **records that would have services performed at Lincoln**
19  **Park since 2020?**
20  A.    No, sir, time sheets would be the only thing
21  that have names and hours put to it that would show in
22  our world the contract was listed.  When I say "our
23  world," the Davey world, as Capital Hill Parks, NPS,
24  Capital Hill Parks, and the time sheets would have that
25  as the contract name and then again hours associated

19

1  with that job.
2        And to kind of, even to get more clarity to
3  that, I can't even tell you a hundred percent if the
4  name would even say Lincoln Park.  We grouped that as
5  Capital Hill Parks, which was the name of the contract
6  on the park service; and we would just service those on,
7  you know, set days, five days a week.  So Lincoln Park
8  could be Tuesday one week, Wednesday the next.  You
9  know, with the time sheets, I couldn't always tell you
10  if Lincoln Park was always written on the sheet.
11  Q.    **Okay.  Who fills the time sheets out?**
12  A.    That would be the crew leader.
13  Q.    **So he could write the name of the specific park,**
14  **or he may not?**
15  A.    Yeah.  And to be honest, going off recollection,
16  I have nothing in front of me.  We would put NPS/Capital
17  Hill.  That was the handwritten name for the contract
18  and the sheet.
19  Q.    **Would this particular crew led by Mike Evans**
20  **have been assigned to multiple parks, or would it have**
21  **just been Lincoln Park?**
22  A.    It would have been multiple parks on this.  They
23  were the only crew assigned to it.
24  Q.    **Do you know how many --**
25  A.    Now again, this is off recollection.  Not to my

20

1  knowledge.  I have the accurate number here.  It was
2  somewhere in the neighborhood of 30.
3  Q.    **One crew was assigned to landscaping maintenance**
4  **for 30 parks around 2021?**
5        MR. BOURY:  Object to form.  You can answer.
6        COURT REPORTER:  Was there an answer?
7        MR. BOURY:  Repeat your answer.
8  A.    I said correct.
9  Q.    **Are you owner or part owner in any other**
10  **companies?**
11  A.    No, sir.
12  Q.    **So I don't want to know about any conversation**
13  **you had with counsel at any point.**
14        Putting that aside, did you meet or speak with
15  **anyone else in preparation for today's deposition?**
16  A.    No, sir, I did not.
17  Q.    **Did you review any documents in preparation for**
18  **the deposition?**
19  A.    Only what was provided by my counsel.
20  Q.    **Okay.  No one -- I don't want to know about**
21  **conversations with your attorney.**
22        **What documents did you review?**
23  A.    Honestly, I don't remember their names.  I mean,
24  I know I looked at what I provided to my counsel which
25  would include performance work statements, things of

JOSHUA PIQUETTE

21

1  that nature. But, you know, without looking at that, I
2  couldn't tell you off the top of my head. That's mainly
3  what I provided to him.
4  **Q.    What is the performance work statement?**
5  A.    It is what the national park provides the
6  contract award winner to perform work within said
7  contract.
8  **Q.    Do you recall any other specific documents that**
9  **you reviewed?**
10  A.    Just the task order that would be associated
11  with that.
12  **Q.    And you understand you have been designated as**
13  **the corporate representative to testify on behalf of**
14  **Davey here today?**
15  A.    Yes, sir.
16  **Q.    You've never previously had to testify on behalf**
17  **of Davey in any capacity?**
18  A.    No, sir.
19  **Q.    Do you know when Davey first began providing**
20  **landscaping services for Lincoln Park?**
21       MR. BOURY: Note my objection as the
22  characterization of landscaping services, but you can
23  answer, Josh.
24  A.    Davey previously worked directly to the National
25  Park Service and the Department of the Interior prior to

22

1  legal action making it become a small business set
2  aside. Davey is a large business obviously, so we hold
3  contracts - again previous to my being with Davey and/or
4  even in the midatlantic, trade from the National Park
5  Service to Davey Tree, however the timeframe we are
6  talking about here, we did not hold any contracts
7  directly with the government. It would have been
8  through Violeta only. That would be the primary
9  contractor.
10  **Q.    That's Violeta Grounds Management?**
11  A.    Correct.
12  **Q.    When did Davey first start providing services to**
13  **Lincoln Park for the Park Service directly?**
14  A.    Again, before me, you know. I can tell you in
15  the timeframe, late Nineties. To be honest with you, it
16  was well before my time.
17  **Q.    Do you know what type of services they were**
18  **providing for Lincoln Park?**
19  A.    Would have been mowing services, what we call
20  grounds maintenance mowing services.
21  **Q.    Was there anything else included in the grounds**
22  **maintenance besides mowing?**
23  A.    Would be string trimming, which is our polite
24  way of saying weed eating; stick edging, which is hard
25  edging for surfaces creating an edge on curbs or

23

1  sidewalks; mulching, bed mulching and weed removal in
2  the beds, leaf removal in the Fall.
3  **Q.    You referenced you became in agreement with**
4  **Violeta to provide services at Lincoln Park eventually,**
5  **correct?**
6  A.    Correct, yeah, when the government requested,
7  obviously again, using RFP's and contracts and things of
8  that nature to become small business set asides. We
9  then in turn, you know, weren't able to bid as much work
10  and perform as much work until we teamed with a small
11  business enterprise in essence.
12  **Q.    So they were prioritizing giving contracts to**
13  **small businesses in the area for services?**
14  A.    The federal government was, yes, on landscaping
15  and nonlandscape, you know, contracts.
16  **Q.    Do you know when the agreement with Violeta for**
17  **NPS started?**
18  A.    Not to my recollection. Again, because that was
19  before me, before my move transition from the beach area
20  to the midatlantic. If I had to put a year on it, it
21  was probably sometime in 2020.
22  **Q.    That was around the time that you transitioned,**
23  **right, 2020 you said?**
24  A.    Correct.
25  **Q.    What was the nature of the relationship between**

24

1  **Violeta and Davey as it relates to providing services to**
2  **the Park Service that began in 2020?**
3       MR. BOURY: Object to form. You can answer.
4  A.    So the relationship was there when the agreement
5  was made upon, again, prior to me. It was said that in,
6  you know, just going to use, let's use the Capital Park
7  as an example. Where Lincoln Park is housed, there is a
8  master sheet that shows location and addresses.
9       Obviously that price was provided to the Park
10  Service. And again, people above me and prior to me
11  working with Davey, that ownership decided what location
12  Davey would perform work on and what locations I would
13  do work on and decision was made from there.
14  **Q.    Was Davey a subcontractor for Violeta under that**
15  **agreement?**
16       MR. BOURY: Form. You can answer.
17  A.    My apologies, yes, sir.
18  **Q.    In 2021 what would have been your involvement**
19  **with respect to the services being provided by Violeta**
20  **and Davey for Lincoln Park?**
21  A.    I probably got involved sometime middle of that
22  year after making the transition and getting, you know,
23  feet wet in a new office, things of that nature,
24  probably mid year. This year I became involved in
25  oversight, more interaction between myself and Violeta

JOSHUA PIQUETTE

7 (Pages 25 to 28)

25

1  as far as communication on scheduling, when routes were
2  going to be performed.  Really that was it at that
3  point.
4  Q.      Who was it you were communicating with at
5  Violeta during this time?
6  A.      It would have been Sheila Wright more often than
7  not.
8  Q.      How would you guys communicate?
9  A.      Phone call or text more than anything.
10 Q.      E-mails sometimes?
11 A.      Occasional.  It was mainly phone call or text.
12 Q.      Do you still have text with Sheila Wright from
13 that timeframe?
14 A.      No, sir.
15 Q.      Why is that?
16 A.      My phone -- I don't have any.  It expires at 30
17 days.  It goes away.  It is in the settings.
18 Q.      Your phone setting is set up for text getting
19 deleted after 30 days?
20 A.      That is correct.
21 Q.      Just all text in your phone that has been sent
22 30 days ago or longer gets deleted?
23 A.      That is correct.
24 Q.      How long has the setting been like that?
25 A.      I couldn't tell you that.  I have no idea.

26

1  Q.      So if you want to go pull text with Sheila from
2  2021 or I guess anything before the past 30 days, you
3  wouldn't be able to find and download anything like
4  that?
5  A.      No, I mean, again, I could probably talk to our
6  IT Department.  I am sure something could be pulled but
7  nothing that is going to be visible on my phone, no.
8  Q.      Is that a Davey policy for the 30-day deletion
9  or your own personal setting?
10 A.      No, personal setting.
11 Q.      What type of phone do you have?
12 A.      I have an iPhone.
13 Q.      Have you had an iPhone since 2020?
14 A.      That is correct.
15 Q.      The same iPhone?
16 A.      No.
17 Q.      Is there anyone else from Davey that would have
18 been communicating with Violeta in that timeframe, 2021?
19 A.      Probably there could have been other production
20 managers talking to her at that time.  But more or less,
21 I got involved, pretty much was just me from there
22 moving forward in 2020-2021.
23 Q.      Is there anyone else from Violeta that you
24 communicated with?
25 A.      Jeremy Wright and Nick Miller, but I don't know

27

1  again, if you have, if Nick was involved until 2021.  He
2  might not have been involved in 2020.
3  Q.      So I understand, this agreement that we've just
4  been discussing for Lincoln Park in the 2021 timeframe,
5  what particular services was Davey contracted to provide
6  for Lincoln Park?
7  A.      It would have been mowing which would include,
8  as we listed again, mowing services.  I will spell that
9  out now.  That would have been the mowing service, would
10 have included mowing, string trim or weed eating, edging
11 where the mower can't get, stick edging hard surfaces
12 which are for curbs or sidewalks for crisp edges along
13 walkways and leaf removal in the Fall.  That is just
14 typically mulching and bagging or removing the leaves in
15 whatever location we were working and remove from the
16 site.
17 Q.      What was the weed eating term you used?
18 A.      String trim.
19 Q.      Explain that again, what that means.
20 A.      That is your weed wacker in your hand to trim
21 and pretty it up.  We call it string trimming,
22 professional word.
23 Q.      And the leaf removal, was that for all areas
24 servicing Lincoln Park?
25 A.      Well, yeah, all areas that I was responsible for

28

1  which would include Lincoln Park.
2  Q.      And within Lincoln Park, what portion of the
3  park was Davey responsible for in providing these
4  services?
5  A.      The entire park.
6  Q.      Wherever there is grass?
7  A.      Wherever there is turf, right.
8  Q.      Is that still the same today, the services?
9       MR. BOURY: Form.
10 A.      My apologies.
11 Q.      Go ahead.
12 A.      We no longer provide services for them at
13 Lincoln Park as of September 2023.
14 Q.      Why did that terminate?
15 A.      To my knowledge they wanted to do more in-house,
16 and that's the answer I was always given.  They wanted
17 to take on more in-house and do more in-house.  It is
18 not required to use us to a certain extent, so they
19 wanted to get -- Again, it is their business.  They
20 wanted to take on more in-house.
21 Q.      Do you know how many Violeta employees were
22 assigned to Lincoln Park during the 2020-2021 timeframe?
23 A.      No, sir, and I don't want to speculate.  They
24 are different than houses.  I couldn't tell you.
25 Q.      I think you referenced Davey was performing

29

1  mowing services, to use your term, at Lincoln Park on a
2  weekly basis back in the 2020-2021 timeframe?
3  A.    Weekly basis is fair, yeah, during the time of
4  year mowing services occurred weekly, usually anywhere
5  late March to beginning of April all the way through the
6  1st of November, we usually perform weekly mowing
7  services again weather permitting.
8  Q.    And that would be once per week?
9  A.    Once per week.
10 Q.    And those once per week mowing services, would
11 those be documented in writing anywhere?
12 A.    Again, the only thing that would show that would
13 be time sheets.  That also would list NPS/Capital Hill
14 Parks, not necessarily, you know, with the verbal
15 written Lincoln Park.  That would be the only
16 documentation.
17 Q.    So no logs of visits or writeups or photos or
18 anything to show the work being performed during this
19 timeframe?
20     MR. BOURY: Objection.  Asked and answered.  You
21 can answer.
22 A.    No, we were strictly there to perform services
23 and time sheets would note that.  Violeta was
24 responsible for any QC's and things of that nature on
25 the sites since they were the contract holder.

30

1  Q.    Okay.  And we are going to get into more of this
2  later on.  I ask that you don't destroy or don't delete
3  any of the time sheets for Lincoln Park going back to
4  2020 and it is something that we would like to get a
5  copy of.
6  A.    Understood.
7  Q.    Besides the weekly mowing services, were there
8  any other type of periodic visits or inspections of
9  Lincoln Park being performed by Davey in this timeframe
10 2020-2021?
11 A.    No, again because, you know, the ultimate QC was
12 to come from Violeta back to the NPS.  It was Violeta's
13 responsibility to ultimately handle that.
14 Q.    What does QC mean?
15 A.    Quality control.
16 Q.    Why do you say it was Violeta's responsibility
17 to handle quality control?
18 A.    Because they were the award winner of the
19 contract, and the contract simply states that the work
20 is being awarded to Violeta only, not Davey.  We are not
21 listed on the task order.  It strictly show you it is
22 from the NPS National Capital Region to Violeta Grounds.
23 Violeta Grounds assumes all, you know, in essence
24 responsibility for providing what the Park Service needs
25 required within the documentation of the contract.

31

1  Q.    In that timeframe, are you aware of anyone from
2  Violeta taking any specific action with respect to
3  supervising or oversight the work of Davey being
4  performed at Lincoln Park?
5  A.    Again, nothing in front of me, nothing
6  accompanying, me, nothing of that nature.  But again, I
7  can only assume I would say there was oversight to an
8  extent by Violeta, but I can't speak for them.
9  Q.    Within that timeframe, did anyone from Violeta
10 ever bring to Davey's attention any issues or concerns
11 or questions about the services Davey was performing at
12 Lincoln Park?
13 A.    We would have conversation of grass height
14 maybe, but that was it; just, you know, there was rain
15 or, you know to use as an example, there was rain in the
16 area where you guys, what day is Lincoln Park scheduled,
17 okay, we are coming tomorrow, whatever it was.  Okay.
18 It was all strictly around grass height as far as mowing
19 height.
20 Q.    Would that be those phone call or text exchanges
21 with Sheila Wright that you referenced earlier?
22 A.    Yes, sir.
23 Q.    And if those concerns were raised by Violeta,
24 that wouldn't necessarily be documented anywhere in
25 Davey's recordkeeping anywhere?

32

1  A.    Correct, nor in ours.
2  Q.    Besides turf height, if there was an issue
3  somewhere within the grass identified, maybe a hole
4  popped up or dead spot, some issue in the grass, would
5  that be something that Davey would be responsible for
6  addressing at Lincoln Park in 2020-2021?
7      MR. BOURY: Object to form.  You can answer, if
8  you understand.
9  A.    Yes, sir.  No, we were not obligated
10 contractually or even requested to perform any services
11 outside of mowing of our turf area.
12 Q.    Do you know whose responsibility that would have
13 been at that time?
14 A.    To the best of my ability, I do not.  Again, not
15 to speak for other people, I would assume that would be
16 the National Park Service.  No one performed work at the
17 same time.  There was no mention of any type of, you
18 know, turf remedies other than mowing.
19 Q.    Did you have any direct communication with
20 anyone from the Park Service about the services being
21 provided at Lincoln Park during this timeframe?
22 A.    No, sir, they were pretty clear, once it was a
23 small business.  The days of old had passed.  Their
24 communication was with Violeta, their contractor.
25 Q.    We will go through some documents now.  Bear

JOSHUA PIQUETTE

33

1  with me one second.  My computer is frozen.  If you
2  would, look at the document on my screen and let me know
3  if you can see it.  Okay?
4  A.    Yes, sir, I got it.
5  Q.    Okay.  Do you know what this document is?
6  A.    Getting a little feedback of chatter.
7        Could you repeat what you said?
8  Q.    Yeah.  Do you know what this document is?
9  A.    Yes, looks to be a purchase order, task order,
10 from the Park Service.
11 Q.    This is a task order?
12 A.    Yes.  If you scroll back up slightly, I think it
13 even labels it or -- Yeah, just order of services, yeah.
14 Q.    Davey was a provider of this task order?
15 A.    I want to say yes.  Again, I don't have nothing
16 in front of me.  But there was -- There were times we
17 were and times we weren't.  Violeta, again, is the
18 contractor or holder.  We were not given everything
19 because we were not the Park Service contractor.
20 Q.    Under the supplies of services highlighted, time
21 of services were provided, which of these services were
22 Davey not providing to Lincoln Park at the time of this
23 contract?
24 A.    It would have been bed maintenance and flower
25 installation not provided by Davey.  Violeta was

34

1  handling that, so no to those.  Excuse me, and pruning,
2  bed maintenance, flower installation and pruning were
3  performed by Violeta.  But again, that would go to
4  certain locations.
5        We didn't do any of that on all locations.  We
6  provided mowing services on, again, I would have to
7  look, but in the neighborhood of 30 locations.  We
8  didn't necessarily provide who's mowing on every
9  location as they kept some of that to themselves as
10 well.
11 Q.    And we are looking at the 40-page Bates
12 production from the government for the task order award
13 that has been previously attached as exhibits.
14        Page 2 here, the period of performance of June
15 2020 to June 2021 with the six-month option to extend to
16 December 2021, are you aware of whether that option was
17 extended?
18 A.    I am aware, yes, it was extended.
19        MR. VISCA:  Let's go off the record.  I do hear
20 feedback.
21        (Off the record.)
22        MR. VISCA:  Back on the record.
23 Q.    Going down to Page 13 of 14, this task order
24 under the Notice of Contract section, have you seen or
25 reviewed this section before?

35

1  A.    Previously or under other contracts, not for
2  this particular -- No, I am familiar with this term and
3  what this is, yes.
4  Q.    This term, Contract Performance Assessment, are
5  you familiar with that?
6  A.    Yes.
7  Q.    See CPARS for short.  What is that?
8  A.    That is like an evaluation, if you want to call
9  it that, evaluation to see how you are performing in
10 again contracts in general.  That is kind of used for
11 evaluation purposes for your ability to, when you do
12 additional work or are awarded the additional work, you
13 know, for the government.
14 Q.    The government prepares these evaluations?
15 A.    Yes.
16 Q.    And they post them in this CPARS system?
17 A.    Yes, CPARS.
18 Q.    Do you know if any such assessment reports were
19 posted with respect to the work being performed by Davey
20 at Lincoln Park since 2020?
21 A.    No, not since 2020.  It wouldn't have been to
22 us.  There would be no CPARS in relation to Lincoln at
23 Davey Street.
24 Q.    Do you know if there were any for Violeta during
25 that timeframe?

36

1  A.    Again, going off my knowledge and background in
2  this line of work dealing with federal work for four or
3  five years, I would have no knowledge or ability as to
4  that as I am not a representative for Violeta.  I would
5  assume it is standard, you know, as for that to take
6  place.
7  Q.    What about the work Davey was directly doing for
8  the government at Lincoln Park before 2020, like the
9  2018-2019 timeframe, do you know if there were
10 assessment reports done for them with respect to Lincoln
11 Park in that timeframe?
12 A.    Again, that was before me.  Nothing that I have
13 seen or nothing safety during this timeframe or anything
14 of that nature.
15 Q.    Looking at the same task, it is attached to this
16 one which is dated May 2020 for Capital Hill Park.
17        Are you familiar with this document?
18 A.    Yes, I am.
19 Q.    What is this document, performance work
20 statement?
21 A.    This is the document that you are pricing, you
22 know, should include what the scope of work is based off
23 the requirements listed by the federal government,
24 usually again, the government entity.  They have
25 similar, you know, NPS calls it a PW.  Others call it a

37

1  PWS. But this is what your pricing and your work to be
2  performed is based off of.
3  Q.    This particular version being attached to the
4  task order was applicable to the services being provided
5  by Violeta in Davey under this contract for Lincoln
6  Park?
7        MR. BOURY:  Object to form.
8        MR. VISCA:  Will you say your answer again?
9  A.    My apologies.  That is correct.
10 Q.    No problem.
11       So Section 1.1.1 related to mowing.  Would this
12 be relevant to the services Davey was providing on this
13 contract by Lincoln Park?
14 A.    Correct.
15 Q.    Is hard scape edging relevant for Lincoln Park
16 at this point?
17 A.    Yeah, I will even give you hand trimming and
18 hard scape edging would be part of mowing services.
19 That was what I was describing prior.
20 Q.    And again, I am interested specifically for
21 Lincoln Park at this point.
22       Leaf removal as well?
23 A.    Yes, correct.
24 Q.    1.3.
25       What about weed removal under 1.5?

38

1  A.    No, sir, not us.  Violeta.
2  Q.    Section 2 deals with recordkeeping and reporting
3  requirements, communications that are required.  So it
4  specifically refers to some reporting and documentation
5  requirements that is required of the contractor.
6        Would Davey be subject to this same
7  documentation or reporting requirements under this
8  agreement?
9        MR. BOURY:  Object to form.  You can answer.
10 A.    No, sir.  Because again, we were not the
11 contracted contractor with the federal government.  We
12 were simply a sub to Violeta.  This was strictly what
13 Violeta would have to in turn provide for the government
14 when requested.
15 Q.    Did Violeta ever request from Davey any
16 particular type of reports, whether periodic, monthly,
17 daily or other kind, for the services being provided
18 under this contract to assist in the reporting
19 requirements for the Park Service?
20 A.    No.  I mean, again it was strictly based off
21 scheduling, you know, when, where we were, things of
22 that nature.  But nothing of formal or formality, no.
23 Q.    Did they ask for the time sheets even for the
24 work being performed at this point?
25 A.    No, they never requested time sheets.

39

1  Q.    The motion height requirement under schedule
2  location of services highlighted Lincoln Park, can you
3  kind of explain what the significance of this section
4  means as it relates to Lincoln Park under the contract?
5  A.    Sure.  So when it says, you know again, mowing
6  maintain at a three inch turf height, what that means is
7  - and I will say generally, then I will kind of describe
8  this - generally speaking in the landscape world in the
9  midatlantic, we are bidding off measurements and man
10 hours which gets you in this area of the world.  We are
11 mowing anywhere from 24 or 30 times in mowing season.
12 Again, that is just in general.
13       To the Park Service what that means is if the
14 mowing height is in excess of three inches and you need
15 to mow twice this week, you know, you mow twice that
16 week.  That is what the performance work statement and
17 this sheet is telling you, that you would have to mow,
18 you know, "x" amount of time to maintain that three-inch
19 height.  There is no quantity in essence.
20       Where if I do a hotel or an apartment complex,
21 it is a set quantity of 26 mows, three prunings, things
22 of that nature.  Where this, with the performance work
23 statement, it tells you that the height has to be
24 maintained, the turf at that height.  It doesn't matter,
25 the frequency.  You have to accomplish that.

40

1  Q.    If there is a particular section in the grass
2  that there is no grass there for some reason because it
3  has a bald spot, a dead spot, some type of damage
4  happened that there is just no grass, you are saying
5  though Davey wouldn't have the responsibility to keep
6  the turf height even at this three inches because there
7  is no grass there to actually cut?
8  A.    That is correct.  And because we, again, that
9  would be something that is probably more of an ad hoc
10 thing if they are looking to do, in our world it is
11 called turf renovations.  That wasn't in scope, nor was
12 it requested by Violeta for us to do.  It is strictly
13 maintaining that height as far as mowing services go.
14 Q.    And that's the chart on 23 of 40 for the record.
15       COURT REPORTER:  Robert, are you marking these,
16 the last two?
17       MR. VISCA:  I will go ahead and attach it.  I
18 attached it previously, but I will go ahead and attach
19 it again.  So we have it here, it is a 40-page
20 composite.  It is not Bates stamped.
21       (Exhibit is marked for identification.)
22 Q.    This document I am showing you now is Bates
23 stamped as starting on NPS Bates number 1, landscape
24 maintenance specifications.
25       Are you familiar with this document?

JOSHUA PIQUETTE

41

1  A.     I don't know about that one in particular.  I
2  have seen documents similar.
3  Q.     You can take a minute to look.  I will scroll
4  down the pages.
5       My question is:  Are you familiar with this
6  specific document?
7  A.     No, sir.
8  Q.     You don't recall this being provided with
9  respect to this contract to Davey?
10  A.     I would hope, you know, it was.  But again, that
11  would have been before my dealing with it, with that
12  date.  That wasn't, you know, my involvement was not
13  there at that point.  I was still down south.  So no, I
14  have no record of it.
15  Q.     But you are familiar with the landscape
16  maintenance specifications document based on services?
17  A.     Yes.
18  Q.     So based on your familiarity and knowledge,
19  would this document be applicable to the services being
20  provided by Violeta and Davey at Lincoln Park under this
21  agreement?
22       MR. BOURY:  Form.  You can answer, if you
23  understand.
24       MR. BARDO:  The United States join.
25  A.     Yeah, because again, it would be the scope

42

1  listed there.  It is in conjunction with that
2  performance work statement.
3  Q.     Do you know what the COR is?
4  A.     Yes, contracting office representative.
5  Q.     Do you know who the COR was for Lincoln Park in
6  that timeframe, 2020-2021?
7       MR. BOURY:  Object to form.  You can answer.
8  A.     No, again because we had multiple NPS contracts
9  at that time, I would have to go back and look but, you
10  know, to see if I can identify which one.  But, you
11  know, at that time they were not communicating with us.
12  So no, I am not aware.  They were communicating solely
13  with Violeta.
14  Q.     Do you know if Violeta had a quality control
15  inspector at the time?
16  A.     No, not to my knowledge with that title.
17       MR. PARLER:  Objection.
18  Q.     Are you aware of any quality control plan or
19  quality assurance surveillance plan in place as it
20  relates to the services under this agreement?
21       MR. BOURY:  Object to form.  You can answer,
22  Josh.
23  A.     No, again because that would have been handled
24  by Violeta, and I wasn't part of that.  I assumed
25  ownership maybe, but I was not a part of any, you know,

43

1  operating plan as far as that goes.
2  Q.     And in essence, no one has ever communicated it
3  to you by Violeta?
4       MR. PARLER:  Objection.
5  Q.     Is that correct?
6  A.     I mean, if there was communication, it was from
7  Sheila as ownership but --
8  Q.     How did Davey go about ensuring that they were
9  maintaining the proper turf height at Lincoln Park per
10  that agreement?
11  A.     Again, it would be based off the height of our
12  decks, the mowing decks.  Standard, you know, deck for
13  Lincoln Park would have been a 60-inch deck, again five
14  foot wide deck sit down mower, blades were sharpened on
15  a weekly basis.  And again, mowing height was
16  determined, you know, what we needed to do each week.
17  Those parks, we were able to cut pretty sharp, pretty
18  low obviously to maintain three inches.
19       So if you are, let's say, at a two-inch height
20  and we get a drought, you know, it is going to take a
21  while to get to three inches again.  So it was all
22  relative to weather and standard preventative
23  maintenance on a weekly basis in conjunction with the
24  actual mowing operations.
25  Q.     Okay.  What do you mean by standard preventative

44

1  maintenance?
2  A.     Blades sharpening, oil changes, things of that
3  nature that take place to help maintain the mower which
4  would maintain the height of the turf.
5  Q.     So even though Davey was going out to Lincoln
6  Park on a weekly basis, they weren't necessarily cutting
7  the grass every week; is that right?
8       MR. BOURY:  Object to form.  You can answer.
9  A.     Again, weather permitting, that could be
10  accurate, yes.
11  Q.     If they went out there and didn't cut grass,
12  what would they do?
13  A.     Our services were not needed at that time.  We
14  were the only one providing mowing services.  We would
15  move on to the next location.
16  Q.     But if that situation occurred when it went out
17  and observed that cutting wasn't needed, their presence
18  there would still theoretically be reflected in the time
19  sheets even though you didn't cut the grass?
20       MR. BOURY:  Form.  You can answer.
21  A.     No, not necessarily.  Again, going back to the
22  fact it was listed, Capital Hill Parks.  We would just
23  move to what locations needed mowing service.
24  Q.     Turning to production, Bates number one, have
25  you seen this document before?

45

1  A.    Yes.
2  Q.    **What is it?**
3  A.    It is the technical proposal that is required to
4  submit when you are bidding on work for the government.
5  Q.    **And this was submitted by Violeta and Davey with**
6  **respect to the National Park Service contract for 2021?**
7         MR. BOURY:  Form.  You can answer.
8  A.    Well, it would have been submitted by Violeta
9  again with our listing as their listing as their teaming
10 partner.  It would have been submitted by Violeta.
11 Q.    **Do you know if anyone from Davey had assistance**
12 **in preparing this proposal?**
13 A.    Not to my knowledge.  And it was not me myself
14 obviously because that was prior to me but not to my
15 knowledge.  I would have to, you know, ask.
16 Q.    **Who was in your role prior to you?**
17        MR. BOURY:  You are getting feedback again,
18 Robert.
19        MR. VISCA:  Can you hear me okay?
20        MR. BOURY:  You may want to restate it.
21 Q.    **Who was in your position prior to you?**
22 A.    It would have been Christopher Moushey.
23 Q.    **Is he still with Davey?**
24 A.    He is not.
25 Q.    **Do you know how to spell his last name?**

46

1  A.    M-O-U-S-H-E-Y.
2  Q.    **Because Davey is listed as the teaming partner,**
3  **are they supposed to comply with the terms set forth**
4  **from this proposal?**
5         MR. BOURY:  Object to form.  You can answer,
6  Josh, if you understand.
7  A.    To the best of my ability, yes.  I would have to
8  refer back to the fact that it is the ultimate
9  responsibility of the primary contractor; but obviously
10 in conjunction with normal practices, yes.
11 Q.    **Who at Davey would be responsible for ensuring**
12 **Davey was complying with the proposal to the extent**
13 **compliance was required?**
14        MR. BOURY:  Objection.  You can answer.
15 A.    That would be myself.
16 Q.    **And how would you go about ensuring compliance?**
17 A.    Again, visual, myself being on sites utilizing
18 management underneath me to provide me feedback,
19 communication with crew leaders, things of that nature.
20        MR. BARDO:  Counsel, could we take a brief
21 restroom break?
22        MR. VISCA:  Yeah.  I am going to log off and
23 back on to see if that helps.  We will come back in a
24 few minutes.
25        (Off the record.)

47

1         MR. VISCA:  Back on the record.
2             BY MR. VISCA:
3  Q.    **I am showing you a document, sir.  This is**
4  **Violeta Bates 54, an October 23rd e-mail from Thomas**
5  **Harvey, National Park Services, Sheila Wright.**
6         **First, I want to ask you:  Do you know who**
7  **Thomas Harvey is?**
8  A.    I have heard the name Thomas Harvey, yes.
9  Q.    **Have you ever spoken with him?**
10 A.    Not that I can recall, no.
11 Q.    **What about a Lewis Harris, did you ever deal**
12 **with him from the Park Service?**
13 A.    I do know Lewis Harris.  I spoke to him mainly
14 about the BW Parkway contract we had with them, nothing
15 pertaining to Lincoln.
16 Q.    **What about James Sledge?**
17 A.    No, again, the name sounds familiar but not to
18 my knowledge.
19 Q.    **This e-mail was sent from Mr. Harvey asking for**
20 **information regarding trip and falls at Lincoln Park**
21 **basically after receiving notice of this lawsuit.**
22        **My question is:  Did Davey receive any request**
23 **for information from the Park Service like this?**
24        MR. BOURY:  Objection.  Form.  Regarding
25 complaints or --

48

1         MR. VISCA:  Yes, regarding trip and falls and
2  incidents like that at the park.
3  A.    No, sir.
4  Q.    **Did Violeta reach out to Davey about these prior**
5  **types of incidents?**
6  A.    Not until December.  I would have to look again
7  at the e-mail chain.  But I did not receive any e-mail
8  chain about this based on the date you show me here.
9  Q.    **At any point in time, has Davey had any**
10 **communication with the Park Service regarding this**
11 **incident, meaning this is Ms. Ryals, the issue that**
12 **happened at Lincoln Park?**
13 A.    No, sir, zero contact.
14 Q.    **And what about Violeta?**
15 A.    As well, no contact.
16 Q.    **I am going to jump down starting on Violeta**
17 **Bates 181 through the end of 252.  There are Davey**
18 **invoices that they produced which they say are for**
19 **services provided at Lincoln Park.**
20        **During this timeframe we have been discussing,**
21 **2020-2021, are you familiar with these invoices?**
22 A.    Yes, sir.
23 Q.    **Are these Davey's standard invoices?**
24        MR. BOURY:  Object to form.  You can answer.
25 A.    Yes, they are.

49

1  Q.    Who prepares them?
2  A.    It would be based off us completing work in our
3  payroll system, then our office coordinators and our
4  world.  Again, when we say something is completed, if it
5  is a bill claim contract, that goes out at the 1st of
6  the month, and this is a bill plan contract.  That is
7  all technically generated from corporate and goes out
8  from there.  You either receive them via e-mail or, you
9  know, old school mail.
10 Q.    This is not the same as time sheets you were
11 referring to earlier?
12 A.    No, no, no, no.  Strictly again, this is a bill
13 plan invoice for that contract.
14 Q.    We didn't receive a copy of any of these
15 invoices from Davey.  Do you know why that is?
16 A.    I mean, it is not pertinent to the Lincoln Park
17 situation.  I mean, bill plan is monthly.  What a
18 monthly bill has to provide you with, as you see there,
19 it lists exactly Capital Hill Park.  There is no mention
20 of Lincoln.  That is just Lincoln, how that contract
21 bill plan contracts go out the 1st day of each month.
22 Q.    These invoices pertain to services provided at
23 Lincoln Park as well, right?
24 A.    Right.  And if you go back right there to
25 monthly maintenance agreement, so everything is done in

50

1  a month on those sites and always bill plans over 12
2  months.  So the same price was given over a 12-month
3  span for that contract from us to Violeta.
4  Q.    And was Violeta doing anything specific to make
5  sure that Davey was doing the monthly maintenance that
6  was being billed for here?
7  A.    I am sure.  Again --
8  MR. BOURY:  Objection.  You are asking about
9  scheduling, things of that nature, I would assume and --
10 MR. VISCA:  Yes.
11 A.    Again, nothing with me in person.
12 Q.    Besides these monthly maintenance invoices, are
13 you aware of any other type of invoice that was
14 generated by Davey with respect to services provided at
15 Lincoln Park during this timeframe?
16 A.    No, sir, should have been strictly these.
17 Q.    I can't remember the term you used, if it was
18 turf restoration or turf repair rehabilitation,
19 something like that earlier --
20 A.    Turf renovations.
21 Q.    Renovations.  Thank you.
22        Are you aware of any turf renovation services
23 provided by Davey at Lincoln Park in 2020-2021?
24 A.    No, sir.
25 Q.    Turning back to the National Park Service

51

1  production Bates 587 to 594, there is an e-mail from
2  November 2019 where the Park Service is discussing
3  issues or concern with the services Davey was providing
4  at Lincoln Park.
5        First, do you know who Diana Bramble is?  Are
6  you familiar with her?
7  A.    No, never heard of Diana Bramble.
8  Q.    What about an Ali Ong?
9  A.    No, sir, not familiar.
10 Q.    So there is a Complaint against, I guess,
11 received from outside individuals, patrons that visited
12 a park, about the condition of Lincoln Park and services
13 provided by Davey that were being referenced.
14       Specifically, my question is:  Was Davey made
15 aware of any of these issues about the Park Service?
16 MR. BOURY:  Object to form.
17 A.    Directly from the Park Service, no.
18 Q.    Were they made aware of it from somewhere else?
19 A.    Again, not to my knowledge.  That right there
20 what you showed did not look familiar to me in the
21 yellow.
22 Q.    My question is:  Did anyone communicate to Davey
23 that there were complaints or concerns about the
24 services being provided by Davey at Lincoln Park in
25 2019?

52

1  MR. BOURY:  Foundation.
2  A.    I wasn't involved in 2019, so I couldn't tell
3  you.
4  Q.    What about in 2020, were you aware of any
5  complaints about services communicated to Davey about
6  Lincoln Park?
7  A.    Other than mowing height, again, nothing to my
8  knowledge.
9  Q.    What about in 2021?
10 A.    It would be the same, mowing height.
11 Q.    In 2022?
12 MR. BOURY:  Objection.
13 A.    It would be the same.
14 Q.    Just about mowing height?
15 A.    Yes, sir.
16 Q.    When were those issues with the mowing height
17 coming from anyone else besides Davey?
18 MR. BOURY:  Form.
19 A.    Can you repeat the question?
20 Q.    Yeah.  Were those issues with the mowing height
21 being communicated to Davey by anyone else besides
22 Violeta?
23 MR. BOURY:  Form.
24 A.    No, sir, not to my knowledge.
25 Q.    And part of your oversight duties with respect

---

53

1  to Lincoln Park in the 2021 timeframe, did that require
2  you to go out to the physical location?
3  A.    On one occasion.  Not often.  I had managers
4  underneath me that would do that.  So, you know, at
5  either my discretion or part of routine checking on
6  crews or routes, making sure things are taken care of,
7  but I have been to Lincoln Park on occasion.
8  Q.    Who would be the manager at that time who would
9  have handled that at Lincoln Park?
10  MR. BOURY:  Form.  You can answer.
11  A.    It would have been a Raul Villa Gomez.
12  Q.    How do you spell the last name?
13  A.    That is: V-I-L-L-A, G-O-M-E-Z.
14  Q.    And then the other manager would have been John
15  Wees as the manager?
16  A.    Yeah, production manager is their title or was
17  their title.
18  Q.    Are they still with Davey?
19  A.    Both are in a different capacity.
20  Q.    Were they performing periodic visits to Lincoln
21  Park in the 2021 timeframe?
22  A.    That is fair to say, yes.
23  Q.    How often?
24  A.    Biweekly.
25  Q.    What was the purpose of those visits?

---

54

1  A.    Ensure services were being performed; ensuring -
2  obviously on our side of things - ensure people are
3  moving through their route, not sitting, moving,
4  continuing to work.
5  Q.    And how would they ensure services are being
6  performed at Lincoln Park?
7  A.    Again, walking the site, coming on site, parking
8  and walk the site to make sure mowing height was
9  established or completed, things of that nature.
10  Q.    They would actually walk around the turf at
11  Lincoln Park?
12  A.    On occasion.  Sometimes it would be a slow
13  drive.
14  Q.    And they handled that together or traded off?
15  A.    Exactly to the years, 2020 was Raul and John
16  Wees would have been 2021.
17  Q.    What are their positions now?
18  A.    Raul is a crew leader and John Wees is an
19  account manager.
20  Q.    Did any of them ever communicate to you any
21  issues with the terms at Lincoln Park during those
22  years?
23  A.    Again, nothing over height.  It is strictly
24  around mowing the turf, nothing else.
25  Q.    I am showing you some pictures that start on

---

55

1  Bates 187 going on to the next page, one more here.
2  Are you aware of any similar type of conditions
3  with holes being present in the ground at Lincoln Park
4  in 2020 or 2021?
5  MR. BOURY:  Form.  You can answer.
6  MR. PARLER:  Objection.
7  A.    No, sir, not to my knowledge.
8  Q.    No one who was working at Lincoln Park for Davey
9  at the time ever mentioned these types of issues?
10  MR. BOURY:  Object.  You can answer.
11  A.    No, sir, no knowledge.
12  Q.    Just give your attorney a chance to object.
13  Pause for a second.
14  Are you aware of any discussions concerning
15  budget constraint, resource issues, with respect to the
16  2021 timeframe?
17  A.    No, I am not.
18  Q.    Are you aware of anyone ever mentioning or
19  complaining of not enough manpower or crews being
20  assigned to maintain the grounds at Lincoln Park in that
21  2021 timeframe?
22  MR. BOURY:  Object to form.  Whose concerns?  By
23  whom?  By the Park Service?
24  MR. VISCA:  Yeah.
25  MR. BOURY:  You can answer.

---

56

1  A.    No.
2  Q.    What about by Violeta, did they ever express
3  such concerns?
4  A.    No, sir.
5  Q.    In the timeframe of 2021, is Davey aware of any
6  damages being done to turf at Lincoln Park by dogs?
7  A.    No, sir, not to my knowledge.
8  Q.    Any knowledge of dogs, whether animals digging
9  creating holes or indents in the grass in that timeframe
10  in Lincoln Park?
11  A.    Again, yeah, not to my knowledge.  I know its
12  location, houses around, but nothing I have ever saw or
13  even brought to my attention.
14  Q.    Are you aware of anyone doing any type of turf
15  replacement at Lincoln Park in 2020 or 2021?
16  A.    No, sir, no, I am not.
17  Q.    What about in 2022 or --
18  A.    As well, no.
19  Q.    -- last year?
20  A.    No, sir.
21  Q.    What about this year?
22  MR. BOURY:  Objection.  You can answer.
23  A.    Yeah, no, we haven't been involved this year
24  since September 2023.  That's zero involvement with
25  Lincoln Park.

57

1  Q.    Are you aware of any issues that arose at
2  Lincoln Park with people going to dig holes or trying to
3  dig up things that may have been buried at the park?
4        MR. BOURY: Objection. You can answer.
5  A.    No, I am not.
6  Q.    Was Davey made aware of any issues with the
7  irrigation system at Lincoln Park with missing or broken
8  splinter heads, stuff like that missing or --
9  A.    No, sir, we were not.
10 Q.    So I will show you some pictures of some holes
11 in the ground at Lincoln Park. I understand you already
12 testified that was not Davey's responsibility under the
13 contract.
14       If an employee of Davey who was assigned to
15 Lincoln Park in 2021 discovered through regular
16 maintenance and services a hole or indent of the grass,
17 would it have been protocol for them to go and notify
18 the Violeta Park Service of the present issue?
19       MR. BOURY: Objection. Speculation. Incomplete
20 hypothetical. You can answer, Josh.
21       MR. PARLER: Objection.
22 A.    Yes. So obviously, you know, again using the
23 mowers, we are on a 50 or 60 inch, 50-foot wide deck.
24 We may not even discover the hole. We can ride over
25 holes. We may never take bumps. We are just mowing

58

1  height. And if that hole is under any turf, we don't
2  have -- If our tires hit it, there is no way to know.
3  Sometimes we may not even know we rode over the hole.
4  This is a hypothetical thing. We can't always see said
5  hole.
6  Q.    I understand that. I am asking in the instance
7  where a hole is discovered, if the wheel went over it or
8  through one, the biweekly walkthrough's, and someone
9  came across a hole or damage issue in the turf itself, I
10 was wondering in that timeframe if it would be Davey
11 protocol for communicating the discovery of that issue
12 to Violeta or the Park Service?
13       MR. BOURY: Objection. You can answer.
14       MR. PARLER: Form.
15 A.    Again, the hole would have to be a pretty
16 substantial size for it to even be on the radar. I
17 don't have a size for that. No protocol set in place
18 for it. Again, we mow turf, millions and millions of
19 turf that I am sure have holes on it. It isn't a set
20 standard, wasn't a requirement to the contract or in the
21 performance statement to be noted. So that wasn't a
22 thing to even be recognized by us, so nothing.
23 Q.    So if an employee brought to your attention a
24 hole that they found in the park, would you not tell
25 anyone? Would you tell someone at Violeta or tell

59

1  someone at the Park Service at that time?
2        MR. BOURY: Objection.
3        MR. PARLER: Object to form.
4  A.    We would have no reason to communicate with the
5  Park Service. So anything found of any magnitude would
6  have to be reported to Violeta. But again, nothing was
7  ever reported to me to report to Violeta.
8  Q.    Other than the documents we've looked at with,
9  you know, the landscaping specs, the task order, the
10 proposal, are you aware of any other written policies or
11 procedures that would be applicable to the services
12 provided at Lincoln Park by Davey in the 2021 timeframe?
13       MR. BOURY: Form. You can answer, Josh.
14 A.    No, sir, nothing else that I am aware of.
15 Q.    Was there any particular program or procedure in
16 place for training employees on what is included or what
17 needs to be done with the services provided on Lincoln
18 Park by Davey employees?
19       MR. BOURY: Object to form. You can answer.
20 A.    Yes, Davey obviously has training programs in
21 place or overall maintenance for those services would be
22 applicable to Lincoln Park, again, routine of mowing
23 operation. We have a Spring rodeo is what we call it, a
24 Spring rodeo. No matter 20 years or 20 minutes, you
25 know, we usually talk to a complaint.

60

1        And again, we are heavily federal government.
2  We have a few nongovernment sides. And we would pick a
3  nongovernment site and we would pick up a mowing
4  station, a shoe string, a mower, operation of a weed
5  pulling station, everything that pertains to mowing
6  services and grounds maintenance, there is a station.
7        I am sorry. You go through -- We work everybody
8  there multiple times in a two-day span. Outside of
9  that, there is obviously we have virtual digital
10 trainings. The digital training is on the portal. That
11 is privy to every employee when you are hired.
12       And again, when you gain your employee number,
13 some training is assigned. Some are, you know, solely
14 on your own at your own pace type of thing at your
15 leisure, these types of things, training standards,
16 horticulture practice training, things of that nature
17 and other through turf and pest management and business
18 administration. The portal offers an unGodly amount of
19 training expertise.
20 Q.    Is there a particular name on the portal or
21 program that is used?
22 A.    Sure. It is called LMS, Learning Management
23 System.
24 Q.    Was that present in 2021?
25 A.    Yes, prior to Davey, something we used

61

1 internally for our guys.
2 Q.    You would have been able to see who completed
3 training when?
4 A.    Yes, not always by notification.  But if you go
5 in --
6 Q.    And again, the other one was called rodeo?
7 A.    Yeah, that is a physical -- We call it the
8 Spring rodeo.
9 Q.    Is there a plan or document that goes along with
10 that training?
11 A.    Not really.  I mean, that is strictly an office
12 scenario, not every office.  We are not required to do
13 it.  It is just a good habit that I like to practice.
14 And again, for the tenured or seasoned vet or a rookie,
15 it's just going to provide a little wakeup call every
16 Spring prior to mowing services.
17 Q.    Do you know if the Lincoln Park crew underwent
18 this Spring Rodeo in 2021?
19 A.    Again, no, I don't have documentation of them
20 being there at that time.  But I would assume so, yes.
21 Q.    Are you aware of the last time someone from
22 Davey was physically present at Lincoln Park prior to
23 the date of this incident which was June 10, 2021?
24 A.    No, I am not.
25 Q.    Has anyone from Davey gone out to assess or

62

1 inspect the area identified where Ms. Ryals' incident
2 occurred since they became aware of this claim?
3 A.    No, sir.  Nobody at Davey performed any
4 investigation into the said incident.
5 Q.    Has there been any internal performance review
6 or assessment since for services right off the Lincoln
7 Park since Davey was made aware of this incident?
8        MR. BOURY:  Form.  You can answer, Josh.
9 A.    No, sir, not aware of any.
10 Q.    Did Violeta do any performance review after
11 receiving notice of this incident for Davey Services?
12        MR. PARLER:  Objection.
13        MR. BOURY:  Objection.  Join.
14 A.    Not to my knowledge, no.
15 Q.    Are you aware of anyone who had knowledge or was
16 aware of the issue described by Ms. Ryals that caused
17 her fall at Lincoln Park prior to the date of incident?
18        MR. BOURY:  Form.  You can answer.
19 A.    No, I am not.
20 Q.    At that time in June 2021, Davey was not aware
21 of any unusual or dangerous issues with the turf at
22 Lincoln Park?
23        MR. BOURY:  Form.  You can answer, Josh.
24 A.    No, we were not.
25 Q.    Have you ever heard about rats creating holes at

63

1 Lincoln Park?
2        MR. PARLER:  Objection.
3 A.    No.  And again, I know rats are there; but
4 nothing pertaining to Lincoln Park, no.
5 Q.    Have you ever been to any events prior to June
6 2021 that may have caused damage to the grass or turf
7 areas?
8 A.    Not to my knowledge.
9 Q.    Does Davey have individuals or departments that
10 deals with any responses if they hear someone was
11 injured or a claim is being made?
12        Is there a particular department or individual
13 that would be responsible for that investigation at
14 Davey?
15        MR. BOURY:  Form.  You can answer, Josh.
16 A.    Davey has an overall, for the entire
17 corporation, we have a safety department.  And obviously
18 internally, we have a claims department.  But that would
19 all need to be generated from the local level and sent,
20 you know, up the ladder, up the chain as far as any
21 incidents reported.
22 Q.    In this case, the local level would be your
23 office, correct, for this particular incident?
24 A.    That is correct.
25 Q.    Were there any such documents or reports up to

64

1 the safety department?
2 A.    Not until I was made aware of this in December
3 of 2023; because at that point we then had to start the
4 trail on our end at the request of our internal claim
5 and safety department.  I did create in essence an
6 incident report.
7 Q.    Is there a legal department or safety department
8 of claims at the time?
9 A.    Yeah, it is in conjunction with all roles up to
10 legal.  It is a sub-department of the Davey umbrella.
11 Q.    Sorry.  You prepared an incident report for this
12 incident?
13        MR. BOURY:  Form.  You can answer.
14 A.    Yes.
15 Q.    What investigation did you do to prepare that
16 incident report?
17        MR. BOURY:  Objection.  You can answer, Josh.
18 A.    Again, only at the direction of our internal
19 claims department when we told them we were just made
20 aware because once I was made aware, I simply forwarded
21 this right along to them.  They said you have to start
22 the paper trail on our end to get the ball rolling.
23        There was no investigation.  It was just a
24 claim.  I was asked to, again, I don't have the term in
25 front of me, but a claim was needed to be generated to

65

1 start things on our end.
2 Q.    You mentioned a paper trail.  Any particular
3 document provided to the claims department along with
4 the report?
5 A.    Just the standard Davey incident report form.
6 Q.    Is that what it is called?
7 A.    Yeah.  I was going to give you more clarity.  We
8 have three forms, A, B and C.  Obviously, I don't have
9 to fill out many of these.  I don't remember which one
10 it is.  One is general liability.  One is -- Again,
11 there is three categories.  Whatever form was required
12 is what I sent.
13 Q.    Is that just the one time that you prepared this
14 form?
15 A.    That is correct.
16 Q.    Did you ever have to update it after that or
17 modify it?
18 A.    Not to my knowledge.
19 Q.    When did you prepare that?
20 A.    It would have been December of 2023.  I believe
21 I had to do it once I was notified.
22 Q.    You didn't go out to a park or somewhere and
23 manage the park to look at the area as part of that
24 investigation in preparation to write the report?
25      MR. BOURY:  Form.  You can answer, Josh.

66

1 A.    No, I did not.
2 Q.    Did you pull any particular records for Lincoln
3 Park to prepare that incident report?
4 A.    No, I did not.
5 Q.    Davey is not aware of any other trip and fall,
6 slip and falls or incidents involving injuries that
7 occurred at Lincoln Park in the last five years?
8 A.    No, sir.
9 Q.    Are you aware whether Davey has been sued by
10 anyone else in the past five years related to an injury
11 that they say was caused in some way by Davey?
12 A.    No, sir.  No, I am not.
13 Q.    Have you had to prepare any other incident
14 reports in the past five years?
15 A.    Yes, I have.
16 Q.    Any related to injuries?
17 A.    No.  Again, not to my knowledge.  I would say
18 more property damage than anything.
19 Q.    Have you or anyone from Davey had any
20 communication with any outside parties with respect to
21 Ms. Ryals' incident, meaning out with the Park Service,
22 not with Violeta, not with counsel, any other third
23 parties with respect to this incident?
24 A.    No, sir.  No, we have not.
25 Q.    Have you had text or e-mails from anyone from

67

1 Davey with respect to this incident?
2 A.    Just to let them know I had an e-mail this
3 morning to remind people above me that I was going to be
4 involved in this deposition, in other words, just to let
5 them know where I was because I am silent but nothing
6 else as far as that goes.
7 Q.    Are you aware of any facts to suggest that Ms.
8 Ryals was responsible for causing her own fall and
9 injuries at the park that day?
10     MR. BOURY:  Form.  You can answer, Josh.
11 A.    No, I am not aware.
12 Q.    Are you aware of any facts to suggest that she
13 is lying or making things up about what occurred to her
14 that day?
15     MR. BOURY:  Objection.  You can answer.
16 A.    No, as well.
17 Q.    Are you aware of any other companies or entities
18 or individuals that provided any sort of services with
19 respect to the turf at Lincoln Park in the years 2020 or
20 2021?
21 A.    No, sir, not aware.
22 Q.    I am showing you a copy of Davey's Answers to
23 Interrogatories in this case and Verified Answers.
24     MR. BOURY:  We do provide verification.  It was
25 supposed to go out last night and went out this morning

68

1 and got stuck in my box.
2     MR. VISCA:  Did you send that to me?
3     MR. BOURY:  I sent it to -- One second.  I can
4 e-mail it to you, if you want.
5     MR. VISCA:  I see the e-mail.  All right.  I am
6 going to use this one.  It is an e-mail.  Let's take a
7 quick break and come back in five minutes.
8     MR. BOURY:  Sounds good.
9     (Off the record.)
10     MR. VISCA:  Back on the record.
11         BY MR. VISCA:
12 Q.    Going back to the Answers to Interrogatories
13 that we received this morning which I will make Exhibit
14 B, is that your signature on the verification, sir?
15     {Exhibit is marked for identification.}
16 A.    Yes, it is.
17 Q.    To the best of your knowledge, the information
18 you stated here is true and accurate?
19 A.    Yes, it is.
20 Q.    Did anyone else from Davey assist you in
21 gathering the factual information to include in these
22 answers?
23 A.    No, only I.
24 Q.    You didn't consult with anyone to help prepare
25 the information?

69

1  A.    No, sir.
2     MR. BOURY: By counsel. Other then counsel?
3     MR. VISCA: Right.
4  Q.    Number three referenced any condition to the
5  extent, any condition that may have been open and
6  obvious.
7     Are you aware of any facts to suggest that the
8  condition that caused Ms. Ryals' fall as alleged in the
9  Complaint was open and obvious?
10    MR. BOURY: Objection. Calls for legal
11 conclusion. You can answer, Josh, in general if you
12 understand.
13    MR. BARDO: United States joins that objection.
14 A.    The answer is no.
15 Q.    Number five, no specific individuals were listed
16 as having knowledge or regarding issues in this lawsuit.
17    Are you aware of any specific individuals who
18 have knowledge related to the incident or the issue with
19 the turf as alleged?
20    MR. BOURY: Object to form. You can answer,
21 Josh.
22 A.    No, I am not.
23 Q.    Who's Brenden Lee?
24 A.    Who is who?
25    MR. BOURY: Robert, you broke up.

70

1  Q.    Brenden Lee.
2     MR. BOURY: You can answer, Josh, if you know.
3  A.    Brenden Lee is the branch manager at the Norton
4  offices.
5  Q.    Where is that office located?
6  A.    Norton, Virginia.
7  Q.    Did that office have any responsibilities with
8  Lincoln Park?
9  A.    In 2020, yes, that would have been with me
10 there.
11 Q.    He has been the branch manager since 2020?
12 A.    That's correct.
13 Q.    What responsibilities would he have had in
14 particular as the branch manager with respect to Lincoln
15 Park?
16    MR. BOURY: Objection. Foundation. You can
17 answer, Josh.
18 A.    Really, none. It was determined when I was
19 there at that point. I was heading all government
20 contracts at that point, so none.
21 Q.    Would he have been dealing with the services at
22 Lincoln Park prior to you coming into that role?
23    I see an e-mail between him and Ms. Wright with
24 regard to the park.
25    MR. BOURY: Object to form.

71

1  A.    Possibly. Again, that could be a possibility.
2  Not once I was there. He also held another contract
3  with her for another national park, so she obviously
4  dealt with him on that contract.
5  Q.    Was anyone else besides you from Davey involved
6  in the search for records responsive to discovery
7  requests made to Davey in this case by Ms. Ryals?
8  A.    No, sir, only myself.
9  Q.    What was the process used to serve for
10 responsive records?
11 A.    What I did was search the drive, the share
12 drive, and digital copies stored there, things of that
13 nature and then obviously e-mail server, just e-mail
14 history.
15 Q.    Did you have anyone else who worked for Davey
16 search their e-mails?
17 A.    No, I did not.
18 Q.    Why not?
19 A.    Honestly, there wasn't that many involved at
20 that time, you know. Higher ups weren't involved at
21 lower level and stuff. Again, when stuff was being
22 awarded to Violeta who is to say we have all the copies
23 anyway? We weren't being delivered stuff in that manner
24 via e-mail and stuff prior. Violeta may have sent
25 something prior that it was piece mail, here's your

72

1  award, here's all of that. It was never --
2     And again, we weren't the ones awarded back
3  then. We are not the primary contractor.
4  Q.    What was the share drive you mentioned?
5  A.    Yeah, like an S-drive, share drive, within the
6  company, again, for the midatlantic region on our
7  computers.
8  Q.    There is a particular folder for Lincoln Park
9  Services there within that share drive?
10 A.    No, no, no, definitely not. That specifically
11 would be for National Park Services. You would have to
12 dive down to see if they put anything in there for
13 National Park Service. It is all based on what the
14 employees put in there.
15 Q.    Did you specifically search in there for
16 documents related to Lincoln Park?
17 A.    Correct.
18 Q.    You did perform this search?
19 A.    Correct.
20 Q.    And you turned over everything you were able to
21 find?
22 A.    Anything I could find was sent to my counsel.
23 Q.    Do you know if any particular document was
24 intentionally withheld or not produced?
25    MR. BOURY: Well, objection. By counsel, we

73

1 withheld no documents.
2 Q.    I will show you a document that was produced by
3 Davey in response to discovery. We have this insurance
4 dec page. We have this e-mail from Sheila to you from
5 June 8, 2021. There is a couple attachments on the
6 sheet and the task order that we went through.
7       MR. BOURY: Just without visualizing everything,
8 I just want to see --
9       MR. VISCA: It is just these attachments. I am
10 going to mark the composite for full production of Davey
11 in this case so far as Exhibit C.
12      (Exhibit is marked for identification.)
13      BY MR. VISCA:
14 Q.    These were all the documents including e-mails
15 you were able to find in your search, services provided
16 from Lincoln Park for the 2021 timeframe?
17      MR. BOURY: Just by counsel, just to clarify,
18 the dec page was obtained by me from corporate and
19 supplied not by Mr. Piquette.
20 Q.    These documents with the bid sheet and this
21 e-mail, these are all documents you were able to locate
22 in your search for your records?
23 A.    Yes, sir, that is correct.
24 Q.    Obviously you mentioned time sheets that were
25 used at that time. Pulling those wasn't part of your

74

1 search, correct?
2 A.    No.
3 Q.    You also looked at invoices for the services
4 provided we also looked at that were submitted to Davey
5 under this contract. That wasn't part of your search
6 either, right?
7 A.    No. And what we looked at was invoices
8 submitted by Davey, not to Davey.
9 Q.    Right. Submitted by Davey. That's what I
10 meant.
11      And the training materials we've discussed, you
12 said there wasn't anything in writing; you said that
13 wasn't part of your search either?
14 A.    No, sir.
15 Q.    Another document to look at that wasn't produced
16 such as that written technical proposal where Davey is
17 listed as teaming partner, but Davey would not have a
18 copy of that document in its records?
19      MR. BOURY: Form. You can answer, Josh, if you
20 know.
21 A.    Again, to my knowledge, no, you know, that was
22 before me when that was provided.
23 Q.    Are you aware of the existence of a teaming
24 agreement between Lincoln Park, excuse me, Violeta and
25 Davey for the services to provide at Lincoln Park under

75

1 the contract?
2       MR. BOURY: Form.
3       MR. PARLER: Asked and answered.
4 A.    Aware, but I have never seen one. It was again
5 arranged prior to me.
6 Q.    Did you search for those documents in responding
7 to the Request for Production or agreement between
8 Violeta and Davey for those services?
9       MR. BOURY: Form. You can answer, Josh.
10 A.    Simply searched in that NPS shared drive;
11 nothing else pertaining to that, no.
12 Q.    And you didn't ask any of the product managers
13 like Ray Wall or Josh or crew leaders from that time,
14 Mike Evans, if they had any text or e-mail communication
15 with respect to services provided at Lincoln Park during
16 this timeframe?
17 A.    No, sir.
18 Q.    I will show for your reference, in Violeta
19 production Bates 56, this e-mail with Sheila Wright to
20 Branden Low and Robert Craft in response, specifically
21 with regard to this incident in Lincoln Park Services
22 that Violeta produced, and I know you got an e-mail, but
23 my point is there is communication we received from, you
24 know, the parties where Davey is involved on at least
25 e-mails.

76

1       Another example, there is an example on Violeta
2 Bates 128, e-mails from 2020. Were you aware there was
3 these communications that exist?
4       MR. BOURY: Just note my objection. I am not
5 sure that they were related to the Capital Parks project
6 or Lincoln Park.
7       But in any event, you can answer, Josh.
8 A.    Again, not to my knowledge. Again, I wasn't
9 even probably involved at that time and I am not even in
10 the e-mail, so no.
11 Q.    Right. I am asking in the context you said you
12 are the only one that was involved from Davey in
13 preparing, searching for records in discovery responses.
14 So I will follow up with your attorney.
15      But with respect to documents that we discussed
16 and e-mails and text, we are going to need a full search
17 done. I am going to reserve the right to continue this
18 deposition with the corporate representative based on
19 any other additional records received from Davey after
20 today.
21      MR. BOURY: Noted.
22      MR. VISCA: Let me check my notes to see if I
23 have anything else. Give me a couple minutes.
24      (Off the record.)
25      MR. VISCA: I am done subject to my reservation.

77

1    MR. BOURY:  Other counsel may have questions.
2    MR. BARDO:  Nothing from the United States.
3    MR. PARLER:  My apologies.  I do not have any
4  questions for this gentleman.
5    MR. BOURY:  I have no followup.
6    MR. VISCA:  So we are done subject to the
7  reservation.
8    Read or waive?
9    MR. BOURY:  Read.
10    COURT REPORTER:  Robert, do you need to order
11  the transcript at this time?
12    MR. VISCA:  Yeah, regular, electronic is fine.
13    MR. BOURY:  I am not sure.  I assume I get a
14  free copy in this instance, but I am not sure of the
15  local arrangement.  So if not, we will order.
16    MR. BOURY:  Mini transcript and regular.
17    COURT REPORTER:  Mr. Parler, do you need a copy
18  as well?
19    MR. PARLER:  Yeah, an e-trans condensed four to
20  a page.
21    And I apologize, but could I have two questions,
22  I think, for Mr. Piquette?
23    CROSS-EXAMINATION
24    BY MR. PARLER:
25  Q.    All right.  Now, Mr. Piquette.  Mr. Visca

78

1  reviewed with you the terms of the contract indicating
2  that the mowing by Davey was to be performed weather
3  permitting; is that correct?
4  A.    That is correct, yeah.
5  Q.    And, in other words, mowing under the contract
6  states that it depends on weather and seasonal changes,
7  right?
8  A.    Correct.
9  Q.    And is it fair to state that Davey would not be
10  doing any mowing on days that it rains?
11  A.    That is an accurate statement.  That is correct.
12  We would hold crews off and push the schedule back a day
13  or what's needed depending on the rain.  Yes, that is
14  accurate.
15  Q.    And if there was a rainfall, how long would
16  Davey have to wait for the turf or for the grass to dry
17  before performing the mowing?
18  A.    That would depend on the amount of rainfall, you
19  know.  Again, hot Summer, thunderstorm passes by, more
20  than likely, we can get out there in the next day, you
21  know.  On 11 inches that is hanging over, it could be a
22  week before we go back out there.
23  Q.    But you mentioned that Davey was doing mowing
24  work at all of the Capital Parks at least in 2020 and
25  2021, correct?

79

1  A.    No, just on what we agreed upon with what
2  location we were servicing with Violeta.  And again,
3  sorry.  I don't have anything in front of me, but let's
4  just round up.  If there are 45 locations, I think we
5  did in the neighborhood of 30 of them, that was mowing
6  services only.
7  Q.    Understood.  If there was a rainy day though and
8  you had a mowing schedule, that would back you up on the
9  schedule for all of the parks that you needed to do.
10    Is that a fair statement?
11    MR. BOURY:  Object to form.  You can answer,
12  Josh.
13  A.    Yeah, that is a fair statement.  And we would
14  push it back a day depending on the rain and the amount
15  of rain.
16  Q.    And have you had the opportunity to look at the
17  rainy days for the first half of June 2021?
18  A.    No, I have not.
19  Q.    Okay.  And if I were to tell you that the
20  records seem to indicate significant rainfall in the
21  District of Columbia on June 3, June 4, June 8, June 10
22  and June 11, would it be fair to state that, first of
23  all, that Davey would not be able to do mowing on those
24  dates?
25    MR. BOURY:  Form.  You can answer.

80

1    MR. VISCA:  Join.
2  A.    Fair.  Again, I would have to know if it is a
3  drizzle.  Then no, we are going to keep working.  We
4  have rain gear.  We keep working.  But we are also not
5  going to put equipment over rocks and stuff touch water
6  with regard to the tires.  So fair to say, again, enough
7  rainfall requires us to push back our schedule.
8  Q.    And so if the records indicate significant
9  rainfall on those dates, that would push back for mowing
10  of parks in the District of Columbia.  That would push
11  back the mowing schedule for all of the parks, right?
12    MR. BOURY:  Form.  You can answer.
13    MR. VISCA:  Form.
14  A.    That is an accurate statement, yes.
15  Q.    Okay.  Is it fair to state that there may be
16  occasion due to rainfall where the turf may exceed three
17  inches simply because the rain has prevented Davey from
18  doing the mowing work?
19    MR. BARDO:  Form.
20    MR. BOURY:  Join.
21    MR. VISCA:  Join.
22  A.    Yes, that is an accurate statement.
23    MR. PARLER:  All right.  I don't have any other
24  questions.  Thank you, sir.
25    COURT REPORTER:  Any followup by anyone?

81

1        MR. BOURY:  I have none.
2        COURT REPORTER:  Mr. Bardo, do you need a copy
3  as well?
4        MR. BARDO:  Same deal as before, Madam Court
5  Reporter.  I need a purchase order in order to purchase
6  the transcript.  So please do not send me a transcript
7  until you received payment from us.
8        (The deposition concluded at 12:25 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

82

1                    CERTIFICATE OF OATH
2
3
4
5
6  STATE OF FLORIDA  )
7
8  COUNTY OF BROWARD )
9
10      I, the undersigned authority, certify that
11  JOSHUA PIQUETTE appeared remotely before me and was duly
12  sworn.
13
14
15      WITNESS my hand and official seal this 26th day of
16  August, 2024.
17
18
19
20
21         SUSAN BARNARD
           Notary Public,
22         State of Florida
           My Commission No. HH 408027
23         Expires:  June 16, 2027
24
25

83

1            REPORTER'S DEPOSITION CERTIFICATE
2
3  STATE OF FLORIDA  )
4  COUNTY OF BROWARD )
5
6      I, SUSAN BARNARD, Professional Shorthand Court
7  Reporter, certify that I was authorized to and did
8  stenographically report the remote deposition of
9  JOSHUA PIQUETTE; that a review of the transcript was
10  requested; and that the transcript is a true and
11  complete record of my stenographic notes.
12      I further certify that I am not a relative,
13  employee, attorney, or counsel of any of the parties,
14  nor am I a relative or employee of any of the parties'
15  attorney or counsel connected with the action, nor am I
16  financially interested in the action.
17
18      Dated this 26th day of August, 2024.
19
20
21
22
23  SUSAN BARNARD
    Notary Public, State of Florida
    My Commission No. HH 408027
24  Expires:  June 16, 2027
25

84

1            E R R A T A   S H E E T
2  DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES
3  IN RE:       RYALS VS. USA
               CASE NO:     23-CV-01270-TSC
4  DATE:        AUGUST 20, 2024
   DEPONENT NAME:    JOSHUA PIQUETTE
5
6  PAGE/LINE       CORRECTION       REASON
7
8
9
10
11
12
13
14
15
16
17      (Use other side if necessary)
18      Under penalties of perjury, I declare that I have
   read the foregoing document and that the facts stated
19  are true.
20
21
   JOSHUA PIQUETTE                    DATE
22
23
24
25

85

1  SEPTEMBER 14, 2020
2  JOSHUA PIQUETTE
   C/O Joe Boury, Esq.
3  LITCHFIELD CAVO, LLP
   303 West Madison, Suite 300
4  Chicago, IL 60606
5  IN RE:   RYALS VS. USA
        Deposition of JOSHUA PIQUETTE
6
      This letter is to advise you that the transcript
7  taken in the above-referenced deposition has been
   transcribed.  Please contact our office at (954)523-5326
8  to make arrangements to read and sign or sign below to
   waive review of the transcript,
9
      It is suggested that the review of this transcript
10 be completed within 30 days of your receipt of this
   letter as considered reasonable under Federal Rules*;
11 however, there is no Florida Statute to this regard.
12    The original of this transcript has been forwarded
   to the ordering party and your errata, once received,
13 will be forwarded to all ordering parties for inclusion
   in the transcript.
14
15 Very truly yours,
16
17 Susan Barnard, Professional Court Stenographer
18
19
   Waiver:
20
   I,                    , hereby waive the reading and
21 signing of my deposition transcript.
22
23 DEPONENT                 DATE
24
   *Federal Civil Procedure Rule 30(e)Florida Civil
25 Procedure Rule 1.310(e).