# EXHIBIT 14

Richard Arlington                2/14/2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------------x

SAMANTHA RYALS,

    Plaintiff,

                      Case Number:

      v.

                      23-1270(ZMF)

UNITED STATES OF AMERICA, et al.,

    Defendants.

--------------------------------x

                          Virtual (via Zoom)

                          February 14, 2025
                            10:08 a.m.

Deposition of:

                RICHARD DANA ARLINGTON, III

the Deponent, called for examination by counsel for

Defendant, pursuant to notice and agreement as to time

and place (virtually via Zoom), before Roland Thomas

Bowman, III, a Notary Public in and for the State of

Maryland, where were present on behalf of the respective

parties:

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

## Page 2

```
 1              A P P E A R A N C E S
    ON BEHALF OF THE PLAINTIFF:
 2
        ROBERT VISCA
 3
        200 SE 1st Street
        Suite 400
 4
        Miami, FL 33131
        305-503-5054
 5
        robert@bfwlegal.com
 6
    ON BEHALF OF THE DEFENDANTS:
 7
        JOHN BARDO, ESQ.
        Assistant United State's Attorney
 8
        601 D Street, NW
        Washington, DC  20530
 9
        202-870-6770
        john.bardo@usdoj.gov
10
    ON BEHALF OF VIOLETA GROUNDS MANAGEMENT CO., INC.:
11
        WILLIAM PARLER, ESQ.
12
        311 Gailridge Road
        Timonium, MD  21093
13
        410-832-1885
        w.parler@parlerlaw
14
    ALSO PRESENT:
15
        JOSEPH BOURY, ESQ.
16
        420 Lexington Avenue
        Suite 2104
17
        New York, NY  10710
        212-818-0311
18
        boury@litchfieldcavo.com
19
        ASHLEY MORRIS, ESQ.
        National Park Service
20
21
22
23
24
25
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
              D.C. Area 301-261-1902
              Balt. & Annap. 410-974-0947
```

## Page 3

```
 1              I N D E X
                                         Further
 2
              Direct Cross Redirect Recross Redirect
 3
    Richard Dana    4   47, 59   73      91      95
    Arlington, III
 4
 5
 6
 7
    EXHIBITS:                                 Marked
 8
      1    February 5th report               82
 9
      2    Photographs                       90
10
      3    Photographs                       90
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
              D.C. Area 301-261-1902

## Page 4

```
 1              P R O C E E D I N G S
 2        COURT REPORTER:  Okay.  We are on the record at
 3  10:08 a.m.  My name is Tom Bowman.  I'm a court reporter
 4  and a notary for the state of Maryland.  We are
 5  conducting this deposition virtually over Zoom.  I was
 6  able to confirm the Deponent's identification though,
 7  Mr. Richard Arlington, with a government-issued photo ID.
 8        Mr. Arlington, can you raise your right hand,
 9  and I'll swear you in.
10        COURT REPORTER:  Thank you. Can you go ahead
11  and state and spell your full name for the record?
12        THE DEPONENT:  Richard Dana Arlington the
13  third, R-i-c-h-a-r-d D-a-n-a A-r-l-i-n-g-t-o-n.
14        COURT REPORTER:  Thank you very much.
15        Mr. Bardo.
16        MR. BARDO:  This is the deposition of Richard
17  Arlington being taken in the case of Samantha Ryals
18  versus the United States of America.  The case number is
19  23-1270, and the venue is the U.S. District Court for the
20  District of Columbia.
21  (Whereupon,
22              RICHARD DANA ARLINGTON, III
23  was called as the Deponent, and after having been first
24  duly sworn, was examined and testified as follows:)
25              DIRECT EXAMINATION
```

              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
              D.C. Area 301-261-1902

## Page 5

```
 1        BY MR. BARDO:
 2    Q   Mr. Arlington, have you have you been deposed
 3  before?
 4    A   I have.
 5    Q   Okay.  So just going through a quick few ground
 6  rules about how this works.  I'm going to ask you a
 7  series of questions.  You have to answer them truthfully
 8  under oath.  The court reporter is taking a typed written
 9  transcript of everything we say here today.  So it's best
10  that we not talk over each other.  So if you could let me
11  finish asking my question before you start answering,
12  that would be great.  And at the same time, I will do my
13  best to make sure to let you finish your answer before I
14  move on to my next question.  The transcript will not
15  pick up silent gestures like nodding your head or saying
16  uh-huh, so it's important that you give verbal responses
17  to my questions.  Sound good?
18    A   Yes.
19    Q   You can request a break at any time.  But if
20  there's a question on the table, I would just ask that
21  you answer the question prior to taking a break.  If I
22  ask a question and you don't understand what I'm asking,
23  could you ask me to rephrase the question?
24    A   Yes.
25    Q   Also, if you don't know the answer to one of my
```

              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
              D.C. Area 301-261-1902

Free State Reporting, Inc.

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Page 6

1   questions, please don't guess or speculate as to what
2   you think the answer is.  It's perfectly fine to say you
3   don't know the answer to the question.  Finally,
4   throughout the deposition, Mr. Visca may object to some
5   of the questions and so some of the other -- the
6   attorneys for the co-defendants may object too.  But if
7   that happens, you still have to answer the question
8   unless Mr. Visca specifically instructs you not to.
9   Makes sense?
10      A    Yes.
11      Q    Before we go -- would you, would you mind,
12  Mr. Arlington, I can only see your nose up.  I can't see
13  -- would you mind adjusting the screen?
14      A    It's mainly because I'm close to the screen
15  trying to hear you.
16          MR. BARDO:  Oh.  Is anybody else having trouble
17  hearing me?
18          COURT REPORTER:  I mean, I did -- this is the
19  court reporter.  I did have to turn the volume up a fair
20  amount, but I'm hearing you clearly now.
21          MR. BOURY:  You're just a little low, Jack.
22          MR. BARDO:  All right.  Not sure why that would
23  be.
24          Rich, Rich, do you have your volume on full
25  volume?

                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902

Page 7

1           MR. ARLINGTON:  I believe so because my wife
2   knows I'm deaf.
3           MR. BARDO:  You have an actual hard-of-hearing
4   condition, or more --
5           MR. ARLINGTON:  Yes, I do.  No, I do.  I
6   actually -- I have 40 percent hearing loss, service-
7   connected disability.
8           MR. BARDO:  Okay.  Well, that's good to know.
9   So, Jack, could we just please (indiscernible) louder
10  than normal?
11          THE DEPONENT:  Yeah.  My volume's up all the
12  way.
13          BY MR. BARDO:
14      Q    Okay.  Great.  All right.  So before we got
15  started, Mr. Arlington, you took an oath to swear to tell
16  the truth.  And although there's -- although there's no
17  judge or jury present, this is still a formal legal
18  proceeding, and you have the same obligation to tell the
19  truth there as you were there, as you would there; make
20  sense?
21      A    Yes.
22      Q    Now is there any reason why you can't give your
23  best truthful testimony today?
24      A    No.
25      Q    So, before we get into too much detail about

                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902

Page 8

1   the case, I'd like to learn a little bit about you and,
2   and your background.  Where were you born?
3       A    Fort Meade, Maryland.
4       Q    Right where the, the NSA is, correct?
5       A    Well, I don't know.  I was born there.  My dad
6   was stationed there in the Army.  So I don't know what's
7   there now.
8       Q    Oh, okay.  All right.  And where, where did you
9   grow up?
10      A    Erie, Pennsylvania.
11      Q    Your whole childhood was in Erie, Pennsylvania?
12      A    With the exception of probably the first two or
13  three years that my parents were in the military, yes.
14  Once we moved back to Erie, I've been here ever since
15  except when I travel myself.
16      Q    All right.  I'm curious.  So I'm from
17  Arlington, Virginia.  I'm curious about what the origin
18  of the name Arlington is; how that became a family name.
19      A    Well, I could tell you the story I heard.  I
20  don't know that it's factual.  But there was a German
21  person back before World War I, and he left from Germany
22  and went to England.  He worked as a groundskeeper, which
23  is kind of funny because that's what I do now.  He got
24  himself a pass on a ship.  He came to America in New York
25  City, in Arlington, settled down there.  My grandfather,

                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902

Page 9

1   when he married my grandmother -- my grandmother worked
2   for the USO during World War II, she was from Erie.
3   So once my grandfather got out of the military from World
4   War II, they moved back to Erie, and the Arlington name
5   became established in Erie.  That's about as far as I
6   know.
7       Q    Interesting.  I've never heard anybody with
8   the, with the name Arlington.  What's the highest level
9   of education you've completed?
10      A    Completed?  Eleventh grade.
11      Q    Did you, did you take any other courses after
12  eleventh grade?
13      A    I did.  I took some college courses when I,
14  when I was in the service, but I never completed my
15  degree.
16      Q    Where did you attend high school?
17      A    Tech Memorial, in Erie, Pennsylvania.
18      Q    And did you -- you, you said you completed
19  eleventh grade.  Did you earn a diploma?
20      A    I earned a GED, yes.
21      Q    So, you served -- you mentioned you served in
22  the military.  What branch of service were you in?
23      A    Marine Corps.
24      Q    What were your dates of service in the Marine
25  Corps?

                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                2/14/2025

Page 10

```
1      A    '80 January of '83 to January of '87.
2      Q    And what rank did you -- were you at when you
3  discharged, I believe is the term?
4      A    E4.
5      Q    Was that -- were you in active duty the entire
6  time?
7      A    Yes, I was.
8      Q    What were the circumstances of your discharge?
9      A    I have a medical discharge for a service-
10 connected injury.
11     Q    What was the nature of the injury?
12     A    Well, it -- it's kind of an embarrassing story,
13 but I was running a PFT and fell in a gopher hole.  And
14 when I did, I shredded my ankle.  They did reconstructive
15 surgery on my ankle,  But then I got staph infection.  So
16 I lost a bunch of ligaments and tendons in my ankle, and
17 they gave me a medical discharge.
18     Q    That sounds awful, like an awful injury.
19     A    Well, it's, it's an awful situation now because
20 I'm older and my ankle doesn't work very much at all.
21     Q    Um-hmm.  Where were you stationed when you were
22 in the Marine Corps?
23     A    I was stationed in California, North Carolina,
24 and Japan.
25     Q    What was -- of those assignments, which one was
```

Page 11

```
1  your favorite?
2      A    Honestly, Japan.
3      Q    Is there a Marine Corps base that you were
4  stationed at specifically?
5      A    In Japan, it was Iwakuni.
6      Q    So that was 1987 you were discharged.  What did
7  you do after you were discharged?
8      A    I came back to Erie, went to work for the
9  United States Post Office, and me and my father started a
10 landscaping.
11     Q    For the Post -- what was the work you were
12 doing for the Post Office?
13     A    I don't know the technical term, but I was a
14 coder.  So it was my job to put a three-digit code on
15 envelopes as they came through a mechanical machine so
16 that it routed it to the right mail delivery person.
17     Q    I see.  How many years did you do that for?
18     A    I didn't.  I probably only worked there for
19 about seven or eight months.
20     Q    And what made you decide to leave?
21     A    The landscape business started to take off, and
22 I needed to have more time to dedicate to that.  Because
23 I was working third shift at the post office, and then I
24 was half asleep all day on the job as a landscaper.  So I
25 had to make a choice.
```

Page 12

```
1      Q    And is your landscape business still, still
2  active today?
3      A    It is and it isn't.  In 2018, I sold my
4  landscape company to my wife's company.  So it merged
5  with her company, and that one's still going on.  So it
6  is and it isn't.
7      Q    Are you involved with the company?
8      A    With my wife's company?
9      Q    Yes.
10     A    Yes.  I'm basically a consultant slash business
11 manager.  I can't, I can't work full-time anymore because
12 I'm -- I have kidney failure, so I'm on dialysis every
13 day.
14     Q    And you went into the -- you started the
15 company with your father, you mentioned?
16     A    Yes.
17     Q    And -- okay.  So why are we here today, based
18 on your understanding?
19     A    We're here today because a lady was walking her
20 dog, and she fell in a hole in a -- in, in the grounds of
21 Lincoln Park in Washington, DC.  And she filed a lawsuit,
22 and now here we are in a deposition.
23     Q    How did you become involved?
24     A    I was contacted by Mr. Visca's office.  They
25 asked me to review the case materials and create a
```

Page 13

```
1  report.  This is what I do as an expert witness.  I do
2  that for snow and ice cases.  I do it for landscape
3  cases.
4      Q    Have you worked with Mr. Visca before?
5      A    No.
6      Q    Have you worked with anyone at Mr. Visca's law
7  firm before?
8      A    Well, I don't know everybody that works for
9  him, so I can't answer that accurately.
10     Q    How did Mr. Visca come to find you?
11     A    Well, I'm assuming that he either got referred
12 to me by somebody else or he found me on SEAK, which is
13 an expert witness listing service.
14     Q    Seat, that's s-e-a-t?
15     A    S-E-A-K, SEAK.
16     Q    Okay.  Oh, yes, I'm familiar with that.  Do you
17 know the plaintiff in this case Ms. Ryals?
18     A    No, I do not.
19     Q    Have you ever met Ms. Ryals?
20     A    No.
21     Q    And is it safe to assume you did not witness
22 the incident firsthand?
23     A    That is correct.
24     Q    So you mentioned you -- you've been designated
25 as an expert witness. right?
```

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                2/14/2025

---

Page 14

```
 1    A    Yes.
 2    Q    What would you -- what's your field of
 3 expertise?
 4    A    Lawn maintenance, landscaping, snow removal,
 5 snow and ice operations, strategic planning for snow and
 6 ice, writing of snow response plans.
 7    Q    Well, for this, for this case though
 8 specifically?
 9    A    It would, it would be lawn care maintenance and
10 overall operation.
11    Q    How did you become an expert in lawn care
12 maintenance?
13    A    Well, I've done it for over 35 years.  I also
14 have the designation as a lawn care industry manager.  I
15 also have another designation as a certified landscape
16 professional.
17    Q    You say the certified landscape professional?
18    A    Yes.
19    Q    What's a lawn care industry manager?
20    A    That is basically a person who oversees or
21 directs lawn care maintenance, mowing operations,
22 trimming operations, fertilization, weed control, things
23 of that nature.
24    Q    And how does, and how does one become a lawn
25 care industry manager?
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

---

Page 15

```
 1    A    There is an organization called the National
 2 Association of Landscape Professionals.  It's a national
 3 organization, and they have a board of governors that
 4 created the certification.  They created the test that we
 5 have to pass, and they monitor us year-to-year for
 6 continuing education credits to retain our certification.
 7    Q    How long have you had this certification?
 8    A    Since 2006.
 9    Q    You mentioned there's a governing board that
10 requires continuing education.  What continuing education
11 is required?
12    A    You have to maintain 13 credit hours per year
13 of either teaching education or receiving education.
14 It's accredited by the National Association of
15 Landscapers.
16    Q    Tell me about these, these courses.  What's a
17 typical course like?
18    A    A continuing education course or the course to
19 pass the test?
20    Q.   The continuing education course.
21    A    It could be, it -- because of my certification
22 I can take a course or a seminar on weed identification,
23 fertilization, proper mowing techniques, proper
24 maintenance of mowing equipment, business, any type of
25 business course that would relate to accounting or
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

---

Page 16

```
 1 business finance, things of that nature; and also high-
 2 level strategic thinking courses.
 3    Q    So you have to do the 13 hours each year of
 4 these types of courses in order to remain a lawn care
 5 industry manager?
 6    A    Yes.
 7    Q    Certified landscape professional.  What is --
 8 what does that involve?
 9    A    That is more in-depth because it gets more into
10 landscaping and lawn care.  So, you know, now you got to
11 know things about excavators, and skid steers, and proper
12 planting of trees, and proper planting of shrubs, and how
13 to build block walls, build retaining walls, and things
14 of that nature.
15    Q    What governing body certifies someone as a
16 landscape professional?
17    A    Same one, National Association of Landscape
18 Professionals.
19    Q    And is there continuing education required for
20 that certification?
21    A    There is.  It's the same 13.
22    Q    Can you use -- you can use the same 13 to keep
23 both certifications?
24    A    Yes.
25    Q    Is this your first time serving as an expert
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

---

Page 17

```
 1 witness?
 2    A    No.
 3    Q    I'm going to refer you to -- if you wouldn't
 4 mind pulling out your report.  You have a list of cases
 5 where you've given depositions and trial testimony.  So
 6 the document, looking at a document the statement of
 7 deposition testimony given.  It's headed, Rich Arlington
 8 and Associates, Consultant to the Snow, Ice and
 9 Landscaping Industries.  Do you have that in front of
10 you?
11    A    I do.
12    Q    And then it lists, it lists 36 cases where you
13 gave deposition testimony.  Is this a complete list of
14 all the cases where you've given deposition testimony?
15    A    It is not.  I have -- we're up to 40, 41 count
16 today.
17    Q    So there have been others since then?
18    A    Yes.
19    Q    Since this report was disclosed?
20    A    Yes.
21         MR. BARDO:  I would just ask Mr. Visca to
22 supplement that list so we have a more up-to-date
23 version.
24         MR. VISCA:  Sure.
25         BY MR. BARDO:
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

---

5 (Pages 14 to 17)

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                 2/14/2025

## Page 18

1    Q    We've also got a list of cases of where you
2  gave courtroom testimony.  Do you see that?
3    A    Yes.
4    Q    It lists 18 cases where you gave courtroom
5  testimony.  Did -- is this a complete list of the cases
6  where you gave courtroom testimony?
7    A    How many do you have?
8    Q    18.
9    A    No.  I'm up to 20 now.
10    Q    Okay.
11        MR. BARDO:  Again same, same request,
12  Mr. Visca.  We would just ask you list those additional
13  two cases.
14        BY MR. BARDO:
15    Q    Now, I see -- is the on this list, is the
16  highlighted party the party that you testified on behalf
17  of?
18    A    Yes.
19    Q    Have you ever testified as a defendant's
20  expert?
21    A    Testified as a defendant's expert?  I believe
22  so.  Number 13, I was working for the defendant.  Number
23  18, I was working for the defendant.  Number 20, I was
24  working for the defendant.  Number 31, I was working for
25  the defendant.  Number 30, I was working for the

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 19

1  defendant.
2    Q    So it's fair to say then you're, you're not
3  you're not strictly a, a plaintiff's expert then?
4    A    No.  I'm -- right now my caseload is about a
5  60/40 split; 60 percent being plaintiff work, 40 percent
6  being defense.  And not that there's any preference on my
7  part.  But once I agree to take a case it's just normally
8  plaintiffs' attorneys contact me first.  I have had
9  defense attorneys contact me in the same case that I'm
10  already retained by a plaintiff.  So it does happen.
11    Q    Have you ever rejected, rejected an opportunity
12  to serve as an expert witness because you couldn't give
13  an opinion that supported the party's position?
14    A    I've given -- I've rejected cases that I didn't
15  feel were a good fit for my expertise.  I've rejected
16  cases that once I review the material, I -- there's
17  nothing I can do to help them.  And I've rejected cases
18  where there was a conflict.
19    Q    When you say there's nothing you can do to help
20  them what, what do you mean?
21    A    Well, I'll give you an example.  It's the best
22  way to describe it.  There was a snow and ice case where
23  I was hired by the defense attorney to represent the
24  snowplowing company.  As I got -- he didn't tell me all
25  this initially.  He gave me the depositions.  As I

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 20

1  reviewed the depositions, in the snow plower's own
2  deposition, he stated that the reason he didn't service
3  the plaza prior to them opening was because he overslept.
4  I have no way to defend that.
5    Q    Okay.  Have that -- have there been any other
6  cases like that?
7    A    Say that again.  I couldn't hear you.
8    Q    Have there been any other cases like that?
9    A    There's been some.  I wouldn't say that there's
10  a lot of them.  It's -- a lot of times I catch things
11  that even the lawyers themselves didn't catch that kind
12  of throw up a red flag in a case.  I've actually had two
13  attorneys in the past 10 years that actually didn't take
14  a case after I reviewed the material and told them what I
15  thought because they just said there's no way to win
16  this.
17    Q    I see.  Have you ever -- has any -- have any of
18  your expert reports ever been struck by a court?
19    A    You mean totally rejected?
20    Q    Yes.
21    A    No.
22    Q    Has your testimony ever been struck by a court?
23    A    Not rejected.  I have been limited, but I've
24  never been rejected.
25    Q    When you say limited what, what -- tell me

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 21

1  about that.
2    A    In New York City they will not allow me to
3  testify about snow standards.  I'm only allowed to talk
4  about reasonable and customary care.
5    Q    But there's never been a case where a court has
6  said you, you can't testify?
7    A    Not that I'm aware of, no.
8    Q    And there's --
9    A    I've done plenty of cases where I never get the
10  deposition, and I never go to trial.  So I don't know
11  what the outcomes of those were, but none that I am aware
12  of.
13    Q    Are you aware of any cases where a court struck
14  your report?
15    A    Not that I'm aware of, no.
16    Q    So we -- at the beginning of the deposition, we
17  talked about the incident that's the subject of this
18  lawsuit.  What's your understanding of how, of how this
19  incident came about?
20    A    Ms. Ryals was walking her dog, and the dog went
21  onto the grass area to do its business, and she fell in a
22  hole holding onto the leash and walking with the dog.
23    Q    And how do you know this?
24    A    From testimony, deposition testimony.
25    Q    Which deposition testimony?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

6 (Pages 18 to 21)

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

## Page 22

1    A    Samantha Ryals.
2    Q    Did you speak with Ms. Ryals about the
3 incident?
4    A    I did not.
5    Q    Who owns Lincoln Park?
6    A    Who owns it?  I'm assuming the U.S. Government.
7    Q    Have you ever visited Lincoln Park?
8    A    I don't believe so.  I've only been to
9 Washington, D.C. once.  So most of my time, most of my
10 time was spent around looking at the White House, the
11 Lincoln Memorial, Jefferson Memorial, but I don't believe
12 that I was in Lincoln Park.
13    Q    So you've never observed the location where
14 this happened?
15    A    Physically, no.
16        MR. BARDO:  Mind if we go off the record just,
17 just for five minutes?
18        THE DEPONENT:  Sure.  Sure thing.
19        (Off the record at 10:39 a.m.)
20        (On the record at 10:48.
21        BY MR. BARDO:
22    Q    Mr. Arlington, I'd like to turn your attention
23 to your report, specifically page, page 3, the part that
24 starts with conclusions and opinions.  Do you do you see
25 what I'm talking about?

## Page 23

1    A    Yes.
2    Q    All right.  The first paragraph, I'll give you
3 a moment to read it, and let me know when you're done.
4    A    Okay.
5    Q    You say here, you say I found no evidence in
6 this case that showed any of the invoices had the work
7 approved prior to payment, or that the work was generally
8 being monitored for compliance with industry standards
9 and the terms of the contract.  Just because you found,
10 quote, no evidence, does that mean it wasn't done?
11    A    No.
12    Q    This -- you then go on to say that this failure
13 in your professional opinion led to the park being in a
14 state that allowed numerous holes to exist in areas where
15 it is known people would be walking, especially those
16 walking a dog.  Could you elaborate on how you make
17 those, those connection that causal connection?
18    A    Sure.  The safety of pedestrians would be first
19 and foremost obligation of the contractors as well as the
20 Park Service.  And the mere fact that these holes
21 persisted over a lengthy amount of time with numerous
22 complaints, and the fact that the grass had overgrown the
23 holes leads me to believe that although it's hard to
24 conceptualize that nobody knew the holes were there, they
25 just flat did nothing about it.

## Page 24

1    Q    What should have been done by the National
2 Park Service?
3    A    Well, in relation to the National Park Service
4 I believe that they could've instituted work orders, have
5 the holes filled in.  It would not have taken a -- it
6 would not have taken a ton of material to fill the holes
7 in.  They could have instituted the filling of holes
8 themselves if they had the manpower to do so.  They could
9 have blocked off the areas that had the holes so that
10 nobody could walk through them.  And those are three of
11 the basic things that could have been done.
12    Q    When you say institute work orders, how would,
13 how would instituting work orders fix this problem?
14    A    Well, if they had told -- this is, this is if
15 they had told Viola (verbatim) that they needed A, B, C
16 holes filled in the northern section of Park A.  Then
17 Viola would have gone out with the topsoil, filled in the
18 holes, thrown a little grass seed on it, and then bill
19 for the appropriate work that was done.
20    Q    So this would -- it would just be documentation
21 essentially?
22    A    Say that again, please.
23    Q    It would just be just you -- never mind.
24 Strike that.  So in the second paragraph, you say it is
25 industry standard procedure to walk an area prior to

## Page 25

1 mowing to remove debris and look for hazards such as
2 holes.  Did I read that sentence correctly?
3    A    Yes.
4    Q    Where is, where is the standard written?
5    A    The -- excuse me.  The word that's missing
6 there is practice.  It's an industry standard practice.
7 There is no set standard that states you should do that.
8 However, it's taught throughout the industry.  And if you
9 look at the actual contract itself, the contract states
10 that they're supposed to walk the grounds looking for
11 hazards and obstacles.
12    Q    So this is, this is a -- you said it's a, it's
13 a practice.  Am I stating your testimony correctly?
14    A    Yeah.  I said there's a word missing in that
15 sentence.
16    Q    You said it's standard -- it's standard
17 industry practice, or, I'm sorry.  Repeat again what word
18 is missing.
19    A    Practice.  So the, the sentence -- and that's
20 my fault.  I left out a word.  But the sentence should
21 read is an industry standard practice and procedure to
22 walk the property.
23    Q    Would failing to do that violate the standard
24 of care?
25    A    In most instances like this, I believe it

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

## Page 26

```
 1   would.  Because if you'd have walked the property,
 2   you'd have found the holes.
 3        Q    How would that, how would that though violate
 4   the standard of care?
 5        A    Because once you found the holes, then you're
 6   obligated to notify the clients of the hazard and the
 7   potential safety risk.  And then the client would make
 8   their own decision as to whether to rectify the problem
 9   or ignore it.
10        Q    This industry practice and procedure you
11   reference, is it, is it written in any standards like the
12   ANSI standards?
13        A    No.
14        Q    Is it written in -- I know I mentioned the ANSI
15   standards, but to clarify, is it written in any
16   standards?
17        A    Well, it's written in the statement of work for
18   the grounds maintenance contract in this case.
19        Q    But the contract wouldn't necessarily specify
20   national standards, correct?
21        A    Correct.
22        Q    You reference what -- to your understanding,
23   what to your understanding what's the contract?  Are you
24   referring to the, to the statement of work?
25        A    Yes.  The statement of work for grounds
```

## Page 27

```
 1   maintenance.
 2        Q    What's your understanding of what the purpose
 3   of the standard of work is?
 4        A    That is what they expect to happen.  It's a
 5   level of expectation.
 6        Q    By the Park Service?
 7        A    Yes.
 8        Q    The third paragraph you say grass can be mowed
 9   at different intervals throughout the season, which is
10   dependent on rain and temperature.  Given this incident
11   occurred in June, I would expect that grass at this time
12   of year was being mowed at least every 10 days to 2 weeks
13   as growth would have been reduced due to temperatures.
14   Did I read that sentence correctly?
15        A    Yes.
16        Q    What's the industry standard for how long grass
17   should be at a place like Lincoln Park?
18        A    How long the grass should be at?
19        Q    At a city at a place like Lincoln Park.
20        A    Well, it's, it's, it's not a matter of place.
21   It's a matter of grass.  So if you have your, your
22   environment in Washington, DC, is not much different than
23   my environment in Erie, Pennsylvania.  So in the spring,
24   you mow the grass every 5 to 7 days.  As you get further
25   into summer, you stretch it out to 7 to 10 days, and then
```

## Page 28

```
 1   it can go to every 2 weeks depending on how hot it
 2   actually gets.
 3        Q    Is there a specified length though that grass
 4   shouldn't be any longer than?
 5        A    You never want it to be taller than three
 6   inches preferably.
 7        Q    And why, why is that?
 8        A    Just because it -- your average mower deck is
 9   between two and four inches in depth, depending on
10   whether it's a push mower, a riding mower, things of that
11   nature.  And they all have different height adjustments
12   on them, and you can adjust the heights from one inch to
13   four inches.  And the grass standard for cutting is to
14   never cut off more than a third of a blade of a, of a
15   grass blade.  So if you're in the height of the growing
16   season, for example, in April, May, you want to try and
17   keep your mowers set at either one or two inches so that
18   the amount of growth that will happen in the next five to
19   seven days is only going to be a third to a half of that
20   size.  That's all you're going to be cutting off.  And
21   then as the year progresses you can raise the lower deck
22   allowing more growth.  Because obviously, when it's hot,
23   the grass needs the ability to hold moisture.  So it
24   needs a longer grass blade.  So if you cut it at one inch
25   all year long, you'd end up burning it out in the
```

## Page 29

```
 1   summertime.
 2        Q    Is the -- when you, you say grass should be
 3   three inches as the ideal length, is, is safety for
 4   people who would walk on the grass.  Is that a
 5   consideration in that in that view?
 6        A    Are you asking if three inches makes the grass
 7   more safe to walk on?
 8        Q    Yes.
 9        A    I don't believe so.  I mean, grass by nature
10   should be safe to walk on at any length.
11        Q    Now you, you say in here that in June the grass
12   would likely be mowed every 10 to 14.  Is that what you
13   said in this report?
14        A    Yes.
15        Q    Was the grass in fact mowed every 10 to 14
16   days, to your knowledge?
17        A    I have no idea.
18        Q    And you, you write in here that the -- that
19   it's due to the climate that makes you believe it should
20   have been mowed every 10 to 14 days, right?
21        A    Well, it's the, it's the temperature and the
22   rain.
23        Q    Right.
24        A    And normally, as you get into summertime, you
25   get less rain and higher temperatures.
```

Richard Arlington                    2/14/2025

Page 30

1    Q    Did you review any temperature data for
2  Washington, DC, in 2021?
3    A    I did.
4    Q    What -- you reviewed that as part of your, as
5  part of your report?
6    A    The only reason, the only reason I looked at
7  it, it was because I wanted to see what the temperature
8  was on June 10th.  And the temperature on June 10th got
9  to a high of 87 degrees.  So that's what led me to my
10 conclusion that with the temperature in June it would go
11 to every two weeks.
12   Q    Did you only look at the weather for June 10th,
13 2021?
14   A    Yes.
15   Q    So you didn't look at the weather for any other
16 day in June of 2021?
17   A    No.
18   Q    So you would -- would, would you have any basis
19 to -- strike that.  In the fourth paragraph you say it's
20 my opinion that the Park Service ignored numerous
21 complaints as it relates to the maintenance of the park
22 and, in fact, the numerous holes in the park landscape.
23 Did I read that correctly?
24   A    Can you restate that?  I think I found the
25 paragraph.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Page 31

1    Q    It's the final paragraph on page 3.  It is my
2  opinion that the Park Service ignored numerous complaints
3  as it relates --
4    A    Yes.
5    Q    Okay.
6    A    I got it.
7    Q    What's your basis for believing that the Park
8  Service ignored complaints?
9    A    The evidence presented in this case gave me a
10 review of emails or message board posts of numerous
11 complaints of holes going back, I believe, to 2016.
12   Q    And what, what's your basis, though, for
13 believing that those issues weren't addressed?
14   A    The mere fact that this hole, in particular,
15 had existed over a long period of time and that even
16 years after this incident that hole still existed.
17   Q    Did you see any evidence that this, this
18 particular -- that anybody complained to the Park Service
19 about this particular hole that Ms. Ryals slipped on
20 prior to June 10th, 2021?
21   A    No.
22   Q    When the Park Service receives a complaint
23 about a hole, what should it do?
24   A    Well, I think the first thing they should do is
25 inspect it to see if it's, if it's a viable safety risk.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Page 32

1  And if it is, then repair it or create a work order to
2  have somebody else repair it.
3    Q    And how, and how much time should they wait
4  before repairing the hole?
5    A    That would depend on the risk.  You know a
6  depression is not as big of a safety risk as a hole.  So
7  if there's a hole, then that should be acted on
8  relatively as soon as possible.
9    Q    When you say as, as soon as possible, same day?
10   A    Well, again, it depends on how they're going to
11 rectify the situation.  If they're going to do it
12 themselves, then it would be as soon as they could get
13 some topsoil and get back to the site to fill it in.  So
14 that may be the same day.  It may be the following
15 morning.  If they're going to contract it out through
16 work order, then it's really going to rely on the
17 schedule of the contractor they assigned the work order.
18   Q    I'm going to show you a picture.  This is a
19 series.  Have you seen these photographs before
20 Mr. Arlington?
21   A    I have, yes.
22   Q    You have.  This is Ryals Bates number 590
23 through 596.  What's this, this picture in 592, is this
24 is this the hole where Ms. Ryals slipped?
25   A    Yes.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Page 33

1    Q    And in 590, is, is this the location where --
2  is this the general location of where Ms. Ryals slipped?
3    A    Yes.
4    Q    In this picture in, in 590 can you can you
5  pinpoint the exact spot?
6    A    Can I pinpoint it?  No.
7    Q    So just, just looking, looking at this picture,
8  you, you can't, you can't see the, the hole.
9    A    You said to pinpoint the exact spot.  No.
10   Q    Okay.  But can you approximate?
11   A    I believe so.  If you take your cursor and move
12 it down a little or down.  Where'd you go?  There you
13 are.  So you go up.  Scroll up.
14   Q    Yeah.
15   A    Right, right in that area.
16   Q    Here?
17   A    No.  A little to the left of that.
18   Q    Okay.  Here?
19   A    No.  Now it'd be to the right of that.  So
20 right in between the first -- there, right, right about
21 there.
22   Q    So you, you said this is the hole?
23   A    Well, no.  It'd be a little lower than that, I
24 think.
25   Q    Here?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Page 34

1    A    That's what looks like a hole, yes.
2    Q    Are you certain this is the location?
3    A    No, I'm not certain.  You asked me if I could
4  approximate.
5    Q    592.  You reviewed this, this picture as a part
6  of your report?
7    A    Yes.
8    Q    Now, this is, this is after -- it says at the
9  bottom it says hole grass removed.  Do you see that?
10   A    Yes.
11   Q    So this is what it looked like after the grass
12 was pulled, correct?
13   A    Yes.
14   Q    Have you seen any pictures of the hole before
15 the grass was removed?
16   A    I believe so, yes.
17   Q    Now to your understanding when, when Ms. Ryals
18 slipped the -- there was grass in this location, correct?
19   A    Yes.
20   Q    Back to that.  What caused this hole to form in
21 your view?
22   A    I honestly don't know.  Could have been another
23 dog digging a hole.  Could have been -- I guess there's
24 some evidence of rats digging holes.
25   Q    In your view is, is this, is this surface

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Page 35

1  unsafe?
2    A    Yes.
3    Q    What makes it unsafe?
4    A    Because it'd be very easy to twist your ankle
5  falling in the hole, going off the side of the hole.
6  Matter of fact, you remember I told you my disability
7  from the Marine Corps was my foot fell in a gopher hole.
8    Q    The -- how deep is this hole?
9    A    You'd have to go back up to where the ruler is.
10 I don't know it off the top of my head.  I believe you
11 got to go up.  Approximately 4 inches.
12   Q    But that's after the grass was removed, right?
13   A    Yes.
14   Q    But with grass in there, wouldn't be quite as
15 deep, right?
16        MR. VISCA:  Object to form.
17        BY MR. BARDO:
18   Q    Let me rephrase that.  Would the hole be as
19 deep if the, if the grass was still there?
20   A    Probably not.
21   Q    What would -- what makes -- what about this
22 hole makes it a tripping hazard?
23   A    Smooth sides.  So if your, if your foot went
24 into that hole, it would get caught on the, on the other
25 side and cause your foot your leg to be pulled out from

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Page 36

1  you.
2    Q    How deep does the hole need to be in order for
3  it to be a tripping hazard?
4    A    Oh, boy.  I wouldn't, I wouldn't have any idea.
5  I assume that depending on how one walks you could trip
6  over one inch.  I know people trip over lifted up pieces
7  of concrete.  So it, it could be any depths that would
8  cause it.  If everything -- if your foot got stuck in it
9  the right way, any, any depths could do that.
10   Q    Is there a national standard where a hole at a
11 location like this is, is too deep and remediation is, is
12 required?
13   A    There not a standard that I know of in relation
14 to that.  OSHA does have standards about holes that need
15 to be covered.  So if you use those standards, then it
16 wouldn't take much at all.
17   Q    Much at all.  How much?
18   A    Well, like I said, it could be one inch, one
19 inch or more.
20   Q    That's the OSHA standard?
21   A    OSHA standard discusses width not depth.
22   Q    So there's no -- you've never personally
23 observed this hole, correct?
24   A    Not this hole, no.
25   Q    Why not?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

Page 37

1    A    I haven't been asked to do a site visit.
2    Q    When you are retained as an expert in matters
3  like this do you typically visit the location?
4    A    Not normally.  Most of the time I'm getting
5  involved in a case years, years after the incident
6  occurred.  So what I'd be looking at wouldn't be the same
7  anyway.
8    Q    Now, on page 4 of your report, the paragraph
9  that starts with ASTMF-1637.  Do you do you see that?
10   A    Yes.
11   Q    What, what are the -- what's the standard that
12 you're referring to?
13   A    It's the standard for safe walking surfaces.
14   Q    I have those standards in front of me.  Why
15 don't we take a look at them.  This is 1637.  I'm looking
16 at a document titled, it's an American National Standard,
17 standard practices for safe walking surfaces.  That's the
18 same thing.  Who sets these standards?
19   A    The American Safety Training or American
20 Society for Testing Materials.
21   Q    And you in, in this, in this report on
22 page 4, you reference a specific standard that's 5.7,
23 right?
24   A    Yes.
25   Q    Standard 5.7.  Let's take a look at that.  Do

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

10 (Pages 34 to 37)

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                    2/14/2025

## Page 38

1  you have 5.7 in front of you?
2      A    I do not.  I did not print the standards.
3      Q    Okay.  Let me share my screen.  Mr. Arlington,
4  can you see can you see my screen?
5      A    Yes.
6      Q    Is this -- do I have, standard 5.7?
7      A    Yes.
8      Q    What does what does standard 5.7 pertain to?
9      A    Exterior walkways.
10     Q    What's an exterior walkway?
11     A    In my industry, any place where people would
12 walk.
13     Q    Does an exterior walkway have, have to be
14 paved?
15     A    Does it have to be paved?  No.
16     Q    So you say in, in your industry an exterior
17 walkway is any place people can walk?
18     A    Correct.  That's the way we use it in the snow
19 and ice industry and the lawn care industry.  Somebody
20 can walk through that area and teach people that this
21 applies.
22     Q    So in your, in your view, this, this standard
23 doesn't strictly apply to paved surfaces.
24     A    Correct.
25     Q    And what's, what's your basis for believing it
            FREE STATE REPORTING, INC.
            Court Reporting  Transcription
            D.C. Area 301-261-1902

## Page 39

1  doesn't apply only to paved surfaces?
2      A    The fact that within the landscape industry,
3  and within the snowplowing industry for that matter, this
4  standard is referenced a lot in different teachings about
5  safety and risk.
6      Q    In the landscape industry, where, where is it
7  referenced that this standard applies to the grass area
8  in an urban park?
9      A    Specifically, to an urban park it's not.  But
10 what we do -- we sit in on seminars about safety and risk
11 and walking conditions.  We're taught to look for holes
12 in lawns, holes in flower beds, especially in as it
13 relates to commercial parking lots where they have
14 islands with irrigation systems.  If somebody had an
15 irrigation head that broke and flooded out, the water
16 would create a hole.  A pedestrian going to walk into a
17 store might walk through that island, fall in the hole,
18 and now you can be sued.  So those types of, those type
19 of environmental conditions are discussed in risk and
20 safety seminars.
21     Q    What are some examples in seminars where this
22 is discussed?
23     A    Well, I couldn't give you an exact name of a
24 seminar.  I'm just telling you from my experience of
25 sitting in on seminars over years that's how I got to
            FREE STATE REPORTING, INC.
            Court Reporting  Transcription
            D.C. Area 301-261-1902

## Page 40

1  know 1637, Section 5.7, because it's been referenced in
2  numerous seminars I've sat in on.
3      Q    Are there paved pathways at Lincoln Park where
4  people can walk?
5      A    Yes.
6      Q    And are those, would you consider those to be
7  exterior walkways?
8      A    Yes.
9      Q    So the paved pathway would, would also need to
10 be maintained according to these standards in 5.7?
11     A    Yes.
12     Q    Turning back to the report.  You write in the
13 same paragraph, it is clear from the information review
14 that the walking surface of this park was not maintained
15 so as to provide a safe walking surface.  Did I read that
16 correctly?
17     A    Yes.
18     Q    What makes a walking surface a safe walking
19 surface?
20     A    That it is level.
21     Q    Level in what way?
22     A    Well, that it doesn't have raised areas.  It
23 doesn't have depressed areas.  It doesn't have large
24 depressions.
25     Q    Is some amount of depressions acceptable?
            FREE STATE REPORTING, INC.
            Court Reporting  Transcription
            D.C. Area 301-261-1902

## Page 41

1      A    Well, I believe, as it relates to grass
2  areas, there, you're going to have some over time, yes.
3  In parking lots, you'll have some over time where cars
4  park, yes.
5      Q    Let's talk about grass areas.  What's an
6  acceptable measurement of a, of a depression in a grass
7  area?
8      A    I don't believe there's a measurement per se,
9  but if there is a gradual slope down that leads to a
10 gradual slope up type of depression, I don't think that's
11 a hazard.
12     Q    You said -- can you, can you put any numbers
13 behind the term gradual?
14     A    Well, if I, if I had to put anything to it, I
15 would probably say a gradual of less than a, less than a
16 8 percent grade.  Something that's very easily walked on.
17 It's not going to cause you to lose your balance.
18     Q    What's the grade of the hole that Ms. Ryals
19 slipped on?
20     A    I have no idea.  I know it's pretty -- it's got
21 a pretty steep side to it.  So I would assume that the
22 grade is pretty close to 90.
23     Q    It's close to what?  I'm sorry.
24     A    I said I would assume it's pretty close to 90
25 degrees.
            FREE STATE REPORTING, INC.
            Court Reporting  Transcription
            D.C. Area 301-261-1902

11 (Pages 38 to 41)

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                    2/14/2025

---

Page 42

1    Q    And what, what are you basing that off of?
2    A    The LiDAR photos.
3    Q    But you don't know for certain whether it's 90
4    degrees?
5    A    I don't, no.
6    Q    Page 5, of the, of the report you referenced
7    some OSHA standards.  What is what, what is OSHA?
8    A    Occupational Safety and Health Administration.
9    Q    And what are the purpose of the standards that
10   OSHA promulgates?
11   A    The purpose of them?  To keep workers and
12   visitors safe on commercial sites, construction sites,
13   things of that nature.
14   Q    Why would OSHA standards apply to a public
15   park?
16   A    Well, per se, I use the OSHA standard for
17   holes.  Because in this instance, we have a deep hole
18   that was left unattended.  So it's just another way of
19   saying that even according to OSHA, this hole should have
20   been covered or repaired.
21   Q    But this, this isn't, this isn't the type of
22   area that would be in OSHA's bailiwick, right?
23   A    Well, it could be because you have commercial
24   contractors mowing the grass, which means you have
25   employees of a contractor mowing the grass, and their

                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902

---

Page 43

1    foot could have just as easily fell in this hole.
2    Q    But Ms. Ryals wasn't there as a commercial
3    contractor, correct?
4    A    Correct.
5    Q    She was just a, a visitor to, to the park,
6    right?
7    A    Correct.  Can we take a break before you ask
8    your next question?
9    Q    Sure, yeah.  How much time do you need?
10   A    Five minutes is fine.
11        MR. BARDO:  Okay.
12        (Off the record at 11:32 a.m.)
13        (On the record at 11:40 a.m.)
14        BY MR. BARDO:
15   Q    Final paragraph on page 5, Mr. Arlington, I'll
16   give you a, give you a moment to read it, and let me know
17   when you're ready.
18   A    What's it start with?
19   Q    Given that -- well, you said given that.  I
20   think you may have given that even years after this
21   incident this goal is still in question.
22   A    Yep.  I got it.
23   Q    I got it.  Okay.  Says the defendants exhibited
24   a clear failure to implement and execute a cohesive plan
25   to identify, remediate, and mitigate potential hazards in

                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902

---

Page 44

1    the grass at Lincoln Park such as the, the
2    inconspicuous hole that Ms. Ryals stepped in as required
3    by the National Park Service's own rules and regulations
4    as well as by applicable industry standards.  This
5    cohesive plan to identify, remediate, and mitigate
6    potential hazards in the grass what, what would that look
7    like?
8    A    Well, we touched on that earlier where the, the
9    grass area would be inspected.  A hole would be
10   identified.  Park Service would be notified; or if it was
11   a Park Service employee, they would know it.  And then
12   the Park Service would have to make a decision whether
13   they were going to remediate the hole themselves or issue
14   a work order to have an outside contractor remediate the
15   hole.  But somebody should have remediated the hole.
16   Q    Is there a standard for how often the site
17   should have been inspected?
18   A    Well, according to the old -- the, the National
19   Park Service own statement of work, it should be
20   inspected prior to each mowing.
21   Q    So you, you described the hole as
22   inconspicuous, right?
23   A    Yes.
24   Q    So should, should the Park Service have known
25   about the hole?

                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902

---

Page 45

1    A    I think the Park Service should have known
2    about holes in general because they were receiving
3    numerous complaints.  I think the Park Service should
4    have known about this hole in particular because it's
5    very hard to believe that Davey Tree would be mowing the
6    grass and never come across this hole.
7    Q    And why, why would that mean that the Park
8    Service has to know about it?
9    A    Because they're obligated to notify the Park
10   Service of any safety hazards or defects that they find
11   when it's process of doing their job.
12   Q    Davey Tree is obligated to know that?
13   A    Well, Davey Tree would tell Viola, and Viola
14   would tell the Park Service.
15        MR. VISCA:  Just to clarify, Rich, when you say
16   Viola, do you mean Violeta?
17        THE DEPONENT:  Oh, I'm sorry.  Yes.
18        MR. VISCA:  Want to make sure we have the right
19   name on the records.
20        BY MR. BARDO:
21   Q    And if Violeta was never told -- or excuse me.
22   Strike that.  If neither Violeta nor Davey Tree ever told
23   the Park Service about this, this hole, there's no reason
24   the Park Service should have known about it; is that
25   correct?

                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902

---

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                    2/14/2025

## Page 46

1    A   I think that's more ambiguous than correct.
2    The Park Service was supposed to inspect the work prior
3    to approving payment of the invoice.  And in my practice,
4    inspecting the work would mean walking the grounds.  So,
5    again, it's hard to believe that somebody could walk
6    these grounds and not see the holes or read the message
7    boards or emails and not know there was holes that needed
8    rectifying.
9    Q   So you, you believe that a Park Service
10   employee should have walked, walked the grounds after
11   each mowing?
12   A   I believe they should have done it at least
13   once a month when they, when they when they got the
14   invoice, yes.
15   Q
         And what's your basis for this opinion?
16   A   The fact that the work had to be approved
17   before the pay -- the invoice could be paid.  And to, to
18   manage our workforce and to inspect the work, you need to
19   do more than just drive around in your car and look.  You
20   need to get out and walk the property.
21   Q   Is there a national standard that says this?
22   A   No.
23   Q   Just to clarify, you -- in the last sentence,
24   you say you refer to the National Park Service's own
25   rules and regulations.  Are you referring to any rules
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
              D.C. Area 301-261-1902

## Page 47

1    and regulations other than the statement of work that
2    we discussed at the beginning?
3    A   No.
4    Q   Whose responsibility is it, in your opinion, to
5    ensure that holes like this aren't in the park?
6    A   To ensure they're not in the park?
7    Q   Correct.
8        MR. VISCA:  Object to form.
9        THE DEPONENT:  I mean, I would, I would believe
10   the ultimate responsibility is the National Park Service.
11   BY MR. BARDO:
12   Q   And why?
13   A   Because they're the ones that own the park.
14   Q   Is anybody else responsible?
15   A   Yes.  You would have delegated obligations to
16   contractors.
17       MR. BARDO:  I have no further questions right
18   now.  I imagine, some of my colleagues have, have a round
19   of questions.
20       MR. PARLOR:  Joe, do you want to go first?
21       Joe, are you there?
22       MR. BOURY:  Sorry.  Yes, I can go.
23                CROSS-EXAMINATION
24   BY MR. BOURY:
25   Q   Mr. Arlington, Joseph Boury.  I represent Davey
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
              D.C. Area 301-261-1902

## Page 48

1    Tree Company in this litigation.  Of the first of all,
2    the last -- one of the last things you said was the
3    responsibility for inspection or the responsibilities of
4    the National Park Service was delegated to the
5    contractors by virtue of contract.  Is that correct?
6    A   You hear me?
7    Q   Now I can.
8    A   Oh, I said yes.
9    Q   Okay.  And where specifically in the contract
10   was that delegated to Davey?  In what contract?
11   A   That would be in the statement of work for
12   grounds maintenance that was the signed contract between
13   the National Park Service and Violeta, and that in turn
14   would have been transferred to Davey from Violeta.  Same
15   statement would apply.
16   Q   And how do you know that it was transferred
17   from Violeta to Davey?
18   A   Because they were working together on the
19   project.
20   Q   And how do you, what do you base that on?
21   A   The deposition testimonies, and where they
22   talked about how Davey did the mowing and Violeta did the
23   tree trimming in mulching.
24   Q   Well, Davey was a subcontractor, were they not,
25   to Violeta?
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
              D.C. Area 301-261-1902

## Page 49

1    A   Yes, correct.
2    Q   And, where in any documents, subcontractor or
3    other, were Violeta's responsibilities transferred to
4    Davey that you're aware of?
5    A   I didn't see any.
6    Q   Of the companies you've owned or worked for, am
7    I correct that the only companies that had lawn or
8    landscaping responsibilities were Arlington Lawn Care and
9    Affiliated Grounds Maintenance Corp?
10   A   Correct.
11   Q   And is one of those your wife's company?
12   A   Yes.
13   Q   Which one?
14   A   Affiliated Grounds Maintenance Group.
15   Q   And the other one was your father and your
16   company?
17   A   Yes.
18   Q   Okay.  And what sort of locations did these
19   companies have landscaping or lawn maintenance contracts
20   for?
21   A   Hotels, commercial plazas.  Arlington Lawn Care
22   did do some parts here in Erie for a couple of seasons.
23   Housing complexes, residentials, and vacant lots.
24   Q   I'm sorry.  I missed the last part.
25   A   Vacant lots and fields.
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
              D.C. Area 301-261-1902

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                    2/14/2025

---

Page 50

1    Q   What park specifically did Arlington have
2  responsibilities for in Erie?
3    A   We had the city parks for the city of Erie.  So
4  you had Frontier Park.  You had Wilson Park.  You had
5  Perry Square.  You had Grandview Park.  You had Bayfront
6  Park.  And I think there was one other one.
7    Q   And how large were those parks approximately?
8    A   I think the largest, the largest one would have
9  been Frontier Park, and that was probably seven acres.
10   Q   Do you know how large, Lincoln Park is?
11   A   No.
12   Q   Do you know if it's more than seven acres?
13   A   Do not.
14   Q   And, do you still have records with respect to
15 the work that was done at these parks?
16   A   In Erie?
17   Q   Yes.
18   A   No.  That was, that was more than 10 years ago.
19 Those records have been destroyed.
20   Q   Was any of that work done through
21 subcontractors, or was it all done through employees?
22   A   It was all done through employees.
23   Q   And how often was the -- actually, I, I should
24 ask you first what exactly did the park work consist of?
25   A   Mowing the grass.  Twice a year we had to trim

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

---

Page 51

1  the shrubs.  And as requested we had to prune trees.
2    Q   How often was the, the mowing work done at
3  those parks?
4    A   Initially, it started out as a weekly basis
5  then it eventually went to every two weeks depending on
6  the weather.
7    Q   And the employees that perform that work at
8  those parks are they still employed by Arlington?
9    A
            No.
10   Q   Those parks, were they municipally owned?
11   A   Yes.
12   Q   By the city of Erie?
13   A   Yes.
14   Q   Or others?
15   A   City of Erie.
16   Q   And I'm sorry again.  What years were, was the
17 work done by Arlington?
18   A   I'm going to say it was probably in the late
19 nineties.  Because my father was still alive, and we had
20 those.  My father passed away in '97.  So it would have
21 been prior to '97.
22   Q   And did the companies have any written policies
23 or procedures with respect to the work that was done at
24 those parks?
25   A   We had the contract from the city.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

---

Page 52

1    Q   Do you still have that?
2    A   That was what we used as our use as our policy and
3  procedure.  Because what we had -- we were required by
4  contract.
5    Q   Okay.  So your, your policies and procedures
6  were governed by the contract with the city; is that
7  correct?
8    A   Correct, yes.
9    Q   And you do not have copies of that contract any
10 longer, those contracts?
11   A   No.
12   Q   If I can come back to an area of your report
13 that Mr. Bardo was, was asking you about, the second
14 paragraph of your conclusions and opinions where you say
15 it is industry standard procedure to walk an area prior
16 to mowing to remove debris and look for hazards such as
17 holes.
18   A   Yes.
19   Q   Is that a procedure aimed at worker safety?
20   A   Yes.
21   Q   All right.  It's not aimed at pedestrian
22 safety; is that correct?
23   A   No.  But it goes hand in hand.  If your workers
24 are safe, your pedestrians are safe.
25   Q   Well that's your conclusion, correct?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

---

Page 53

1    A   Yes.  Okay.
2    Q   And if you have a mowing contractor that is
3  engaged in park mowing, how often are they supposed to
4  walk the grounds; every time?
5    A   Well if  you, if you look at the fact that
6  they're mowing it, they're walking it while they're
7  mowing.  If they --
8    Q   Well -- go ahead.
9    A   They should, they should at least walk the area
10 that they're going to be mowing before they start mowing
11 to look for hazards.
12   Q   All right.  Well, let's assume that the park is
13 10 acres in area.  Is the contractor supposed to walk
14 that entire 10 areas, 10 acres before mowing every time
15 that they mow?
16   A   According to the statement of work, yes.
17   Q   And what is it about the statement of work that
18 says to you that they should do that?
19   A   Well Section 1.1.1 requires walking the grounds
20 prior to mowing.
21   Q   In your opinion, is that a practical approach
22 for a mowing company?  Can a mowing company do that
23 economically, walk the entire area of a park every time
24 that they're there weekly or every 10 days to mow?
25   A   If they built it into their price for the bid,

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

---

Free State Reporting, Inc.

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                    2/14/2025

## Page 54

1  yes.
2      Q   Do you know if that was built into the price in
3  this instance between --
4      A   I don't -- price of the contract was.
5      Q   .
           Say again.  I'm sorry.
6      A   I said I don't know what the price of the
7  contract was.
8      Q   And you're not aware of any other terms of any
9  contract that imposes any requirement on Davey to walk
10 the entire area of the park; is that correct?
11     A   Correct.
12     Q   Your list of cases where you detail your expert
13 services, how many of the cases that are listed involve
14 lawn maintenance or landscaping issues?
15     A   I believe only two.
16     Q   Okay.  Which two are those?
17     A   Verna Hynes.
18     Q   Can you just give me the numbers?
19     A   Like 16?
20     Q   This is in the deposition list?
21     A   Yes.
22     Q
           Okay.  And what was the other one?
23     A
           Number 39, which you don't have.  That's on my
24 newer list.
25     Q   Okay.  What's the name of it?  Do you recall
                 FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                 D.C. Area 301-261-1902

## Page 55

1  offhand?
2      A   It is Briana Pryor versus Chicago Parks D
3  district.
4      Q   I'm sorry.  Could you say that one more time?
5      A   Briana Pryor versus Chicago Parks District.
6      Q   And where is that case venued?
7      A   Chicago, Illinois.
8      Q   And do any of the cases in which you provided
9  testimony to the extent that they're different involve
10 any landscaping or lawn maintenance issues?
11     A   They both do.
12     Q   Are they the same -- those would be the same
13 two cases I assume.  Are there any other cases in the
14 testimony list versus the deposition list?
15     A   No.
16     Q   No.  Okay.  So the Hynes case what was the
17 issue in the Hynes case?
18     A   A mower had thrown a rock.
19     Q   And what happened to the pedestrian in the
20 prior case.
21     A   Same thing.  Mower threw a rock and injured the
22 pedestrian.
23     Q   Is the Hynes case concluded?
24     A   As far as I know, yes.  My case file is closed.
25     Q   And I take it probably the Pryor case is just
                 FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                 D.C. Area 301-261-1902

## Page 56

1  beginning in its infancy at this point; is that right?
2      A   Yes.  That's (indiscernible 1:36:00.8).
3      Q   Have you provided any report or deposition
4  testimony in that case in Pryor?
5      A   Yes, I did.
6      Q   Okay.  So both, both the report and deposition?
7      A   Yes.
8      Q   Okay.  I think you said it was Chicago that --
9  to your knowledge, that's Cook County Superior?
10     A   Yes.
11     Q   Okay.  Did the other cases in general involve
12 snow and ice issues be fair to --
13     A   Yes.
14     Q   And that's really your area of expertise, isn't
15 it, the snow and ice issues not lawn maintenance like
16 from an expert standpoint.
17     A   Yeah.  I get hired a lot more in snow and ice
18 cases.  Yes.  Absolutely.
19     Q   Yeah, because that's the, you know, that's the
20 essence of your credentials, correct
21     A   Yes.
22     Q   Mostly ice and snow safety, correct?
23     A   Yes.
24     Q   Do you have any specific information that Davey
25 was actually aware of the hole that plaintiff claimed she
                 FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                 D.C. Area 301-261-1902

## Page 57

1  tripped and fell in?
2      A   As I stated earlier, I would find it very hard
3  to believe that they could mow this grass and never see
4  never find this hole.  Wheel of the lawnmower could have
5  fell in it.  Their whole foot could have fell in it.
6      Q   There's -- that's not my question.  My question
7  is do you have any information that Davey in fact was
8  aware of this particular hole?
9      A   No.
10     Q   And you don't know what caused this hole,
11 correct?
12     A   Correct.
13     Q   And you don't know how long it was there before
14 June 10 of '21, correct?
15     A   Correct.
16     Q   And you've never been to Lincoln Park, correct?
17     A   Correct.
18     Q   And you've never seen this particular hole,
19 correct?
20     A   Correct.
21     Q   Do you know whether or not if one's on a riding
22 mower of, I don't know, 30, 40 inches wide, whether or
23 not they could have observed this particular hole when
24 there was grass in it.
25     A   They'd have felt it if their tire went in it.
                 FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                 D.C. Area 301-261-1902

15 (Pages 54 to 57)

Free State Reporting, Inc.

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                 2/14/2025

Page 58

1    Q   Yeah.  If their tire went in it.  But there's
2  no information, correct, that Davey's lawnmower tires
3  went into this hole at any point in time; isn't that
4  correct?
5    A   Correct.
6    Q   If someone -- we looked at a photograph before
7  from the sidewalk looking at the grass area.  Do you
8  believe that that hole was observable from -- by anyone
9  from that sidewalk area?  Anyone performing any work for
10  Davey?
11    A   Probably not.
12    Q   Because you couldn't see it, correct?
13    A   Correct.
14    Q   You said that you had seen photos with the
15  grass removed from the hole.  Looking at your file do you
16  have such photos, and do they have a Bates stamp number
17  of any kind?
18        MR. PARLER:  Does anybody know who just joined
19  us?
20
21        MR. BARDO:  Yes.  Ashleigh Morris, an attorney
    with the National Park Service.
22        MR. PARLER:  Okay.  Thanks.
23        THE DEPONENT:  No.  That might still be on my
24  computer, but they're the same ones that was shown to me
25  by Mr. Bardo.
             FREE STATE REPORTING, INC.
             Court Reporting  Transcription
                D.C. Area 301-261-1902

Page 59

1        BY MR. BOURY:
2    Q   Okay.  And which of those photographs do you
3  contend show the hole without grass?  I'm sorry, with
4  grass before it was removed?  Sorry.  That wasn't a --
5    A   I don't, I don't think any of those did.
6    Q   Okay.  And you've not seen any photographs of
7  the hole as it  appeared before the grass was removed by
8  the Plaintiff or someone on her behalf; is that correct?
9    A   Correct.
10    Q   And my last question are you aware of any
11  instance in which the standards that you're relying on
12  and giving your opinions in this case have been applied
13  by any court or any government agency to a lawn surface
14  area?
15    A   No.  This is actually the first case I've ever
16  done with a landscape hole.
17    Q   But, again, whether or not it's your first case
18  are you aware of any determinations by either a court or
19  any governmental agency applying the standards that you
20  rely on in another context?
21    A   No.
22        MR. BOURY:  That's all I have.  Thanks.
23           CROSS-EXAMINATION
24        BY MR. PARLER:
25    Q   Mr. Arlington, Bill Parler.  I've got a few
             FREE STATE REPORTING, INC.
             Court Reporting  Transcription
                D.C. Area 301-261-1902

Page 60

1  questions for you.  Are you aware, sir, of any evidence
2  that anyone with Violeta grounds management was aware of
3  the presence of the hole that the plaintiff allegedly
4  tripped on before June 10th, 2021?
5    A   No.
6    Q   Okay.  The AT, ASTM standard referred in your
7  report at 1637-21, are you aware of any courts in the
8  District Of Columbia that have ever applied or adopted
9  that standard?
10    A   No.
11    Q   Are you aware that the ASTM has put out, has
12  published a statement with regard to ASTM -- 1637 stating
13  that it does not apply to natural walks and unimproved
14  pass?  It says both of those are beyond the scope of this
15  practice?
16    A   Yes.
17    Q   You were aware of that?
18    A   Yes.
19    Q   Is it -- would you agree with me that where the
20  Plaintiff claimed she tripped was a natural walkway or an
21  unimproved path?
22    A   Yes.
23    Q   Okay.  Same question for ANSI 1264.  Are you
24  aware of any District of Columbia cases in which that
25  standard has been adopted?
             FREE STATE REPORTING, INC.
             Court Reporting  Transcription
                D.C. Area 301-261-1902

Page 61

1    A   No.
2    Q   Are you aware that ANSI has put out a statement
3  1264 that says that it sets, sets forth standards for
4  reducing the risk of slip missteps in workplace
5  situations?
6    A   No.
7    Q   You were not aware of that?
8    A   No.  I never knew that only applied to
9  workplace.
10    Q   Would you agree with me that this trip and fall
11  of Ms. Ryals did not occur in her place of work?
12    A   Not in her place of work.  No.
13    Q   Okay.  And have you been furnished with any
14  information by Mr. Visca on the frequency with which the
15  Plaintiff visited Lincoln Park for the weeks and months
16  and years prior to June 10th, 2021?
17    A   Yeah.  I believe there was some testimony that
18  she would walk her dog up to three times a day at the
19  park.
20    Q   And for how long was she doing that prior to
21  June 10th, 2021?
22    A   I don't know that number off the top of my
23  head.
24    Q   Would you expect somebody that's visited the
25  park three times a day to be familiar with the general
             FREE STATE REPORTING, INC.
             Court Reporting  Transcription
                D.C. Area 301-261-1902

16 (Pages 58 to 61)

Richard Arlington                    2/14/2025

## Page 62

1  conditions of the park?

2      A   Yes.

3      Q   You don't have any legal training, correct sir?

4      A   Correct.

5      Q   And part of your report -- let me ask this.

6  You have actually done two reports in this case, correct?

7      A   I believe so.  Yes.

8      Q   What's the difference between the first report

9  and the second report?

10     A   The summary motion judgment, and the fact that

11 I was asked to elaborate on the amount of time that the

12 grass had been not cut around the hole.

13     Q   Okay.  What do you mean motion for summary

14 judgment?  Did you receive a copy of Violeta's motion?

15     A   Yes.

16     Q   And you were asked to, what, draft a response

17 to it?

18     A   I was -- when I, when I read it, I just I

19 talked with the attorney, and we --

20         MR. BARDO:  Let me just cut you off.  Focus on

21 factual and document information, but any discussions

22 about how to draft or update --

23         THE DEPONENT:  That's fine.

24         MR. PARLER:  Well, wait a minute a minute.  You

25 number one, he wasn't finished.  And number two, he was

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 63

1  about to tell me, I believe, information that you gave

2  him that he used in formulating his opinions because that

3  was the nature of the question.

4          MR. BARDO:  Can talk about factual information

5  that informed his opinions.  He's not permitted -- it's

6  privileged to talk about discussions with an attorney

7  about changing a report.  So that's why I cut him off.

8  You could talk about whatever facts or documents he was

9  provided that he used to update his report.

10         MR. PARLER:  Okay.  Well, number one, you

11 interrupted.  Number two, I'm sure you want to know about

12 privileged information and communication, Mr. Parler,

13 correct?

14         That's a presumptively improper speaking

15 objection under Rule 30.

16         MR. BARDO:  Asking about privileged

17 communications is also improper.  So I just helped you

18 out.  He may answer the question based on facts.

19

20         MR. PARLER:  I didn't ask him about -- I asked

20 him -- that was not the question.  The question was what

21 was the purpose of the report?  And he acknowledged

22 looking at Violeta's summary judgment motion.

23         BY MR. PARLER:

24     Q   And what else did you review, sir, before your

25 supplemental report?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 64

1      A   I've reviewed, different types of grasses,

2  different, different things that can cause grass to grow,

3  and trying to figure out an estimated time period of how

4  long the grass had gone without being cut based on the

5  photo.

6      Q.  Okay.  In the new report, which is dated

7  February 5th, 2025, you cite the deposition testimony of

8  Sheila Wright at page 69.  Do you know at pages 69 to 70

9  of her deposition which contract Sheila Wright is

10 referring to?

11     A   I would believe she's referring to the contract

12 between Violeta and Davey Tree.

13     Q   Okay.  And is that different than the contract

14 between Violeta and the Park Service?

15     A   I don't think so.

16     Q   Okay.  Was the Park Service a party to the

17 contract being discussed by Sheila Wright at page 69 of

18 her deposition?

19     A   No.

20     Q   Okay.  And you indicated that the, the

21 performance standards for the contract with the Park

22 Service, you were asked by Mr. Boury, and you said

23 Section 1.1.1 requires the -- somebody to, to walk the

24 park before mowing is performed.  Is that correct?

25     A   Yes.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 65

1      Q   And can you tell me specifically where in

2  Section 1.1.1 of the performance standards it says that

3  someone's required to walk the grounds?

4      A   No.

5      Q   Okay.  Do you know, once the, the mowing task

6  under the contract with the Park Service were assigned to

7  Davey's what Violeta's specific duties were under the

8  contract from June 2020 up through June 10th of 2021?

9      A   Well I believe Sheila answered that question in

10 -- on page 69.  She said my letter would remain

11 responsible for overall performance of the contract and

12 overall management of the authority and responsibility

13 for the entire project.

14         MR. PARLER:  I'm going to object and move the

15 strike because it's not responsive to the question.

16         BY MR. PARLER:

17     Q   What I'm asking you, sir, is do you know, from

18 June of 2020 through June 10th of 2021, what specifically

19 Violeta or Violeta employees were doing at the park

20 related to landscape work?

21     A   Yes.  They were doing mulching and trimming.

22     Q   Okay.  Do you know what areas of the park

23 involve the Violeta mulching and trimming work?

24     A   No.

25     Q   Do you know if, if there was any -- for the,

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

## Page 66

1  for that same timeframe June of 2020 through June 10th
2  of 2021, do you know if there was any mulching or
3  trimming work to be done anywhere in the northwest
4  quadrant of Lincoln Park?
5      A   I don't believe there was.  No.
6      Q   The pictures that you were shown by Mr. Bardo,
7  that were Bates stamped, I believe, 590 through 594 or
8  595, from plaintiff's document production, do you know
9  when those photographs were taken?
10     A   After the incident.  I know that.
11     Q   Okay.  Do you know how long after the incident?
12     A   Not that I can recall.
13     Q   Okay.  Do you know if it was longer than a year
14  after the incident?
15     A   Not that I can recall.  I don't remember the
16  date that that was done.
17     Q   Do you know if it was 16 months after the
18  incident?
19     A   Again not that I can recall.
20     Q   Do you know if those photographs were taken
21  during the time of year when mowing typically either
22  slows down or is suspended because of the onset of cold
23  weather?
24     A   No.
25     Q   No, you don't know?

## Page 67

1      A   No, I don't know.
2      Q   Do you know of anyone else that tripped and
3  fell or slipped and fell in Lincoln Park and sustained
4  injuries in 2021.
5      A   No.
6      Q   Do you know of anyone that tripped and fell or
7  slipped and fell in Lincoln Park from 2020 through 2025?
8      A   No.
9      Q   Do you know of anybody that tripped and fell or
10  slipped and fell in Lincoln Park from 2015 to the
11  present?
12     A   No.
13     Q   Have you been furnished with any data on the
14  many hundreds of thousands of human visitors to Lincoln
15  Park every calendar year?
16     A   No.
17     Q   Is it fair to state, however, that Lincoln Park
18  with its location and areas for dogs is routinely visited
19  by hundreds of thousands of people every year?
20     A   I would agree with that.
21     Q   And is it fair to state that every calendar
22  year hundreds of thousands of dogs are taken to the park
23  to Lincoln Park by their human owners?
24     A   Yes.
25     Q   Okay.  And is it also a common practice in

## Page 68

1  Lincoln Park for those owners to unleash their dogs so
2  that they can run around and play, go to the bathroom,
3  and dig as they see fit?
4      A   I wouldn't know that.
5      Q   Okay.  If that was the case, would you agree
6  with me that dogs that are unleashed will run, go to the
7  bathroom, and dig?
8      A   Yes.  I own five dogs.
9      Q   Well, then you should know then.
10     A   Yes.
11     Q   Then I'll agree you're an expert on dogs in
12  this case.
13     A   Okay.
14     Q   And are you familiar with the District of
15  Columbia law distinguishing a subcontract from a
16  contractual assignment?
17     A   No.
18     Q   Okay.  Sir, you mentioned -- have you been
19  essentially disabled because you're on dialysis daily
20  from 2018?  Since 2018?
21     A   No.  I, I became fully disabled in 2021.
22     Q   Okay.  Is it fair to state then that a 100
23  percent of the income you personally generate is derived
24  from your forensic work or your work on court cases?
25     A   If you want to call it that, yeah.

## Page 69

1      Q   Okay.  And is it --
2      A   I went from making over $100,000 a year to
3  maybe making 300 bucks a month.
4      Q   Okay.  And, okay.  Would you say that close to
5  a 100 percent of your professional time is involved in
6  working on forensic matters or the court cases?
7      A   Yes.
8      Q   Okay.  And you mentioned that you were -- that
9  your advertisement or listing is in an expert for hire
10  manual that I think you referred to as SEAK; is that
11  correct, S-E-A-K:
12     A   Yes.  It's -- that's, that's not my
13  advertisement.  That's Rich Arlington and Associates,
14  LLC's advertisement, and that company is, is owned by my
15  son and my wife.
16     Q   That's your name though, right, Rich Arlington?
17     A   Yes, correct.  It's also my son's name.
18     Q   And how, how many years have you been listed in
19  this expert for hire manual?
20     A   I want to say probably at least the last seven
21  or eight.
22     Q   And what do you have to pay for being listed in
23  the expert for hire manual every year?
24     A   I want to -- I think it's 695.
25     Q   $695?

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

## Page 70

```
1       A   I believe so.  And then we have we, we have
2   what's called the profile page too.  That's 250 a month.
3       Q   Where is that published?
4       A   In SEAK.  Still in SEAK.
5       Q   So 695 a year, and 250 a month gets you a
6   listing in a national expert for hire manual, correct?
7       A   Yes.
8       Q   Are you listed in any other expert for hire
9   publications?
10      A   I believe I'm still on Experts.Com and
11  JurisPro.
12      Q   And what -- do you have to pay for those
13  listings?
14      A   They do.  I'm not sure what the total is now.
15  When I used to write the checks, it was like 295 or 395 a
16  year.
17      Q   Okay.  When you say they do, you're talking
18  about your wife and son who are now the officers in
19  charge of Richard Arlington, LLC, correct?
20      A   Yes.  Yes, that's correct.
21      Q   And where, where is this LLC?  Is it in
22  Pennsylvania?  Is that where the articles --
23      A   Yes.
24      Q   Okay.  On your case list -- let me back up
25  for a second.  You've never testified in deposition or a
                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902
```

## Page 71

```
1   trial in any case that was set or pending in the
2   Superior Court of the District of Columbia or the United
3   States District Court for the District of Columbia,
4   correct?
5       A   I know I did something in Washington, DC, way
6   back in the --
7       Q   The only thing I saw on your list involving a
8   District Of Columbia attorney is Gregory Thompson versus
9   Wackenhut Services, a security company.  Was that a -- do
10  you know where that case was filed?
11      A   No.  Not off the top of my head, no.
12      Q   And were you -- can you tell us what that case
13  was about?
14      A   What number is it?  Oh, never mind.
15      Q   Number four on the deposition list.  It's from
16  2010.
17      A   No.  There's nothing that comes to mind, and
18  that was 15 years ago.
19      Q   Can you tell us what you did to prepare for
20  today's deposition?
21      A   Basically reviewed, reviewed my case file,
22  looked at photographs, went back through, and, and looked
23  at the standards that I quoted.
24      Q   On your report --
25      A   That's it.
                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902
```

## Page 72

```
1       Q   I'm sorry.  I didn't mean to interrupt you.
2   I apologize.
3       A   I just said I think that's it.
4       Q   On your February 5th, 2025, report, you list
5   documents, and number 12 is -- it says documents produced
6   by Amber Gove, G-o-v-e, in response to subpoena.  Do you
7   know what that is?
8       A   Do I know what it is?
9       Q   Yeah.  Because I don't, and that's why I'm
10  asking you.
11      A   It could be -- it could just be a typo.
12      Q   Was Amber Gove an entity involved in one of
13  your other expert for hire cases?
14      A   No.  That name doesn't even ring a bell.
15      Q   So in looking at the list is there -- strike
16  that.  Okay.  In your -- strike that.  Did you have any
17  conversations with anyone after you were retained in this
18  case that you relied on in formulating any opinions?  Did
19  anybody tell you anything that you found to be important?
20      A   The only conversations that I had outside of
21  the attorney was just me and my son discussing the
22  parameters of the case.
23      Q   What was your son's role in, in this case?
24      A   Believe it or not he's actually my boss,
25  overseeing what I was doing.
                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902
```

## Page 73

```
1       Q   When your son reviewed your reports, did he
2   make any changes?
3       A   The only thing my son did was typos.  I had a
4   lot of I'm a, I'm a landscaper.  I'm not an English
5   major.  My son's actually a college graduate.  So he
6   corrects my English all the time.
7       Q   Okay.  Besides correcting typos in your report
8   did your son do anything else?
9       A   No.  No.  He's a certified snow professional,
10  but he's not a certified landscape professional.
11          MR. PARLER:  I think that's all I have for you,
12  sir.  Thank you.
13          THE DEPONENT:  Can we take another break before
14  somebody else gets started?
15          MR. PARLER:  Sure.
16          MR. VISCA:  Yeah, I think, I think I'm I'm up
17  next, but I got to get my notes together anyways.  I have
18  some follow-up.  So why don't we why don't we come back
19  at 12:45?
20          MR. BARDO:  Good.
21          (Off the record at 12:32 p.m.)
22          (On the record at 12:46 p.m.)
23               REDIRECT EXAMINATION
24  BY MR. VISCA:
25      Q   Mr. Arlington, I just have a few follow-ups
                FREE STATE REPORTING, INC.
                Court Reporting  Transcription
                D.C. Area 301-261-1902
```

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                 2/14/2025

## Page 74

1   based on the questions the other attorneys asked you
2   here today.  Kind of going to work backwards; probably
3   jump around a little as well.  Your recall you were asked
4   about the item on your report with the list of documents
5   that you were provided for your review from documents
6   produced by someone by the name of Amber Gove.
7       A   Yes.
8       Q   Amber Gove is a custodian for an entity called
9   Friends of Lincoln Park.  Do you recall being provided
10  with e-mails from the entity Friends of Lincoln Park
11  specifically as they relate to complaints about the
12  maintenance and care of Lincoln Park over the years?
13         MR. PARLER:  Objection, leading.
14         BY MR. VISCA:
15      Q   Go ahead, sir.
16      A   Yes.
17      Q   What do you recall about the e-mails from
18  Friends of Lincoln Park that you received?
19      A   There was numerous complaints about holes, poor
20  upkeep and maintenance of the park.
21      Q   Do you recall specifically if there was any
22  mention of what was believed to cause those holes that
23  are being complained of?
24         MR. PARLER:  Objection.
25         THE DEPONENT:  Yes.  It was rats and dogs.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 75

1          BY MR. VISCA:
2       Q   You recall being asked if you had seen any
3   photos showing the area where the incident occurred
4   before the grass had been torn out in that certain subset
5   of photos that you were shown?  Do you recall that?
6       A   Yes.
7       Q   Take a look at these photos.  I'm sharing my
8   screen.  Just for the record they are Bates range
9   starting on page Ryals 1033, going consecutively through
10  Ryals 1045.  Have you seen these photographs before?
11      A   Yes.
12      Q   Did you review these photographs in preparation
13  of your original and supplemental report?
14      A   Yes.
15      Q   And these photographs are dated 6-13-2021; is
16  that correct?
17      A   Yes.
18      Q   And that would have been three days after the
19  date of Ms. Ryals fall?
20      A   Yes.
21      Q   Looking at these pictures do you see any
22  picture in here that shows the grass being torn or
23  disturbed or removed in any way from the subject area?
24      A   No.
25      Q   So would you agree that these photos show how

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 76

1   the area looked without being removed of any grass
2   three days after the incident?
3       A   Yes.
4       Q   Looking at photo Ryals 1037, what does that
5   depict in your opinion?
6       A   The tape measure being placed inside the hole
7   to measure the depth.
8       Q   Is that consistent with what you viewed on the
9   LiDAR images that you also reviewed in your opinion?
10      A   Yes.
11      Q   Showing you an additional set of photographs
12  produced in this case starting with Ryals's Bates range
13  1047 going consecutively to Ryals's 1055.  Have you seen
14  these photographs before?
15      A   Yes.
16      Q   Did you review these as part of your review to
17  create your original supplemental report?
18      A   Yes.
19      Q   And what's the date listed on these photos?
20      A   June 20th, 2021.
21      Q   Do these photos show the subject area having
22  been disturbed, damaged, or grass removed in any way?
23      A   No.
24      Q   You were asked a couple times about
25  distinguishing between a national standard a national

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

## Page 77

1   industry standard versus industry standard practice and
2   procedure.  Do you recall that?
3       A   Yes.
4       Q   And I think you clarified at one point that the
5   word practice was missing in your report.  It should've
6   been, industry standard practice.
7       A   Correct.
8       Q   So where -- there is no necessarily written in
9   this national industry standard for the grass maintenance
10  or, or landscaping that would be applicable to the
11  situation here in which you prepared your report.  Would
12  it be fair to say that your opinions on what the National
13  Park Service, Violeta, and Davey Tree Company should have
14  done with respect to this Lincoln Park incident were
15  based on industry standard practices?
16         MR. PARLER:  Objection to form.
17         THE DEPONNET:  Yes.
18         BY MR. VISCA:
19      Q   And are these industry standard practices based
20  on what you've learned and experienced in your decades-
21  long experience in this particular field?
22         MR. PARLER:  Objection.
23         THE DEPONENT:  Yes.  They're what they're what
24  I've learned, and also different things that I've taught
25  other contractors.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

## Page 78

1      BY MR. VISCA:
2      Q   Specifically, as it relates to the field of
3  landscaping, correct, and lawn maintenance?
4      A   Yes.
5          MR. PARLER:  Objection.  Move to strike.
6      BY MR. VISCA:
7      Q   You were asked briefly about the updated or
8  supplemental report that you prepared that stated
9  February 5th, 2025.  Do you recall those questions?
10     A   Yes.
11     Q   Now, February 5th is the day in which you
12  prepared that report?
13     A   Yes.
14     Q   I want to go through some of the opinions from
15  this report.  Looking at Paragraph 2 that starts the
16  particular hole at issue.  You see it on your screen?
17     A   I do.
18     Q   Are you on -- this starts on the bottom of
19  page 3, the second paragraph under conclusions and
20  opinion section.  You state in your report, quote, the
21  particular hole at issue had existed for an extended
22  period of time long enough for grass to regrow in the
23  hole.
24     A   Right.
25          MR. PARLER:  Objection, asked and answered.
                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

## Page 79

1      BY MR. VISCA:
2      Q
3          You go on to say the sharp edges of the hole
   indicate that the ground within the hole was dug out or
4  removed.  The shape and features of the hole do not
5  indicate that is a depression caused by pushing the grass
6  down.  Thus the hole at Lincoln Park would have existed long
7  enough for the grass to regrow in the hole after being
8  removed.  This would take weeks if not months or longer.
9  And then next sentence, you refer to photographs taken of
10  the hole at around the time of the incident further
11  indicate that the hole was allowed to persist for the
12  extended period of time as a result of insufficient
13  improper maintenance, end quote.  The photographs that
14  you're referring to are those the two sets of photographs
15  that I just showed you?
16     A   Yes.
17          MR. PARLER:  Objection.
18  Go ahead.
19     BY MR. VISCA:
20     Q   Can you please elaborate on the basis for your
21  opinion that this particular hole existed for an extended
22  period of time that would have existed forweeks, if not
23  months or longer, please, what the basis --
24          MR. PARLER:  Objection to the extent that he's
25  already answered that question in response to questions
                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

## Page 80

1  from two attorneys in this case.
2          Go ahead.  I'm sorry.
3          MR. VISCA:  Didn't ask him about these
4  opinions.  You're the only one that actually asked him
5  about this, this report, and you did not go into specific
6  basis.  So I'm allowed to follow-up with with, with these
7  questions.
8          So go ahead sir.  What's the basis for these
9  opinions?  Please elaborate.
10         MR. PARLER:  Objection.
11         THE DEPONENT:  So in my experience and, again,
12  I own five dogs.  So dogs do dig holes.  If in fact this
13  hole was created by a dog, you would have dirt piled up
14  along the sides, and you would have no grass in the hole.
15  So when you're looking at the pictures that you just
16  showed earlier, you did not see dirt piled up, which
17  means that that dirt had been displaced either by rain,
18  people walking, what have you.  And you see that the hole
19  is full of grass now, which is a natural occurring thing.
20  Grass will populate itself on on given dirt; so will
21  weeds.  And for that to happen would take, you know, a
22  bare minimum of three to four weeks because that's how
23  long it takes for a new lawn to come in.  So if you were
24  left with just dirt, you're looking at a bare minimum of
25  a month.  And sometimes it could take even longer
                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

## Page 81

1  depending on what type of grass it is.
2      BY MR. VISCA:
3      Q   Going back to one of the photos you reviewed
4  that we've been discussing here, Ryals 1037, okay.
5  Please describe what you observed with respect to the
6  length and and type of the grass coverage here, and how
7  that is relevant to your opinion as to how long the hole
8  must have existed at a minimum timeframe?
9          MR. BOURY:  Objection.
10         MR. PARLER:  Objection.
11         THE DEPONENT:  Well, if you look at the grass
12  blades, the grass blades seem to be more than three
13  inches tall.  You also look at the clover, which is the
14  little white flowers, if the grass had been mowed
15  recently, those white flowers wouldn't be there because
16  they had been cut off by the lawn mower.
17     BY MR. VISCA:
18     Q   So in your professional opinion, this is the
19  way the grass appears in this photo as of June 13th,
20  2021, this grass had not been cut anytime recently to
21  this photo?
22         MR. BOURY:  Object to the form.
23         MR. PARLER:  Object to the form.
24         THE DEPONENT:  Correct.
25     BY MR. VISCA:
                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

21 (Pages 78 to 81)

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Page 82

```
 1     Q    How would you expect this area to look if the
 2  grass had been recently or freshly cut?
 3          MR. PARLER:  Objection.
 4          MR. BOURY:  Objection.
 5          THE DEPONENT:  You would see the -- white
 6  flowers would not be there or be very sparse.  And if you
 7  actually looked at the the grass blades, they would be
 8  cut and not pointed.  And if you look in this photograph,
 9  they're pointed.
10          BY MR. VISCA:
11     Q    Go back to the report.  Looking back at your
12  February 5th report -- going to attach as Exhibit 1.  I
13  don't think anybody has attached it.  I don't think
14  anyone has attached it.
15          (Exhibit 1 was marked for identification.)
16          BY MR. VISCA:
17     Q    We're on -- all right.  So on page four, go to
18  the, I guess, second full paragraph -- excuse me -- third
19  full paragraph where it starts, it is clear from review
20  of the photos.  You see that there?
21     A    Yes.
22     Q    It starts to talk about grass having gone
23  extended period of time not being serviced, and
24  referencing the sprouts.  Is this a section that
25  coincides with the opinion you just explained about the
```

                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

Page 83

```
 1  growth in the area around the time of the incident?
 2     A    Yes.
 3     Q    So it is your opinion that not only had the
 4  hole existed for several weeks, if not months, but that
 5  the grass had also not been cut for an extended period of
 6  time as of the June 13th '21 date of the photographs?
 7          MR. PARLER:  Objection to the form.
 8          MR. BOURY:  Objection.
 9          THE DEPONENT:  Yes.  Based on the, based on
10  the photographs, yes.
11          BY MR. VISCA:
12     Q    Now, again, based on what you reviewed with
13  respect to the complaints that have been lodged by
14  individuals and entities regarding the condition and
15  maintenance of Lincoln Park over the years how would the
16  notice of those complaints with respect to rat holes,
17  lack of maintenance, or dogs off leash, how should that
18  have informed the Park, National Park Service, Violeta
19  and Davey's actions with respect to completing regular
20  inspections of the grass area at Lincoln Park in 2021
21  based on your professional opinion?
22          MR. BOURY:  Objection.
23          MR. PARLER:  Objection.  The question assumes
24  facts not in evidence.
25          MR. VISCA:  There's no speaking objections.
```

                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

Page 84

```
 1  I'll ask you if I want it.
 2          BY MR. VISCA:
 3     Q    Go ahead, sir.
 4     A    Okay.  So when they received the complaints
 5  via message board or email those should have been
 6  correlated out to the appropriate parties to actually go
 7  physically inspect the park for where these complaints
 8  are lodged.  And then they would have noticed, they
 9  would have noticed the problem, and they could have
10  addressed it and fixed it.
11     Q    What about specifically in terms of a more
12  proactive preventative policy or plan to prevent or, or
13  catch potential issues that existed in the grass area
14  prior to cutting.
15          MR. BOURY:  Objection.
16          MR. PARLER:  Objection to form.
17          THE DEPONENT:  Well, I think there could have
18  been a standard procedure to carry topsoil with the
19  maintenance crew.  And as they found holes, fill them in.
20          BY MR. VISCA:
21     Q    Did you see any evidence of that type of plan
22  being carried out at any point in time in any of the
23  documents you reviewed?
24     A    No.
25     Q    Do you recall reviewing National Park Service
```

                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

Page 85

```
 1  policies and procedures with respect to what they
 2  expected for the landscaping maintenance at Lincoln Park
 3  in 2021
 4          MR. PARLER:  Objection to form.
 5          MR. BOURY:  Objection.
 6          BY MR. VISCA:
 7     Q    Is that a yes?
 8     A    Yes.
 9     Q    You recall seeing anything in there with
10  respect to quality control management?
11          MR. BARDO:  Objection.
12          THE DEPONENT:  Yes.  They were supposed to
13  have, what they call it, a COR representative that would
14  inspect the quality of the work, and they were supposed
15  to report on a daily, weekly, and monthly basis.
16          BY MR. VISCA:
17     Q    Based on your view of the documents produced by
18  the parties in this case, was that -- were those periodic
19  communications and quality control plan implemented in,
20  in this case?
21          MR. BOURY:  Objection.
22          MR. PARLER:  Objection to form.
23          THE DEPONENT:  No.
24          BY MR. VISCA:
25     Q    In your professional opinion, had there been
```

                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

Free State Reporting, Inc.

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Page 86

1  these daily, weekly, periodic, inspections and
2  assessments of the park condition, how would that have
3  played into their ability to identify and address hazards
4  located in Lincoln Park during this time frame?
5         MR. PARLER:  Objection.
6         MR. BOURY:  Objection.
7         THE DEPONENT:  They would have been able to
8  notice the hazards, and it could have been brought up the
9  chain to resolution.  The Park Service ultimately would
10 have, would have the ending responsibility to make
11 the decision to fix it or not fix it.
12        MR. PARLER:  Objection.  Move to strike.  Calls
13 completely for this gentleman to speculate.
14        MR. BOURY:  Go ahead.
15        BY MR. VISCA:
16    Q  Do recall prior to you preparing your
17 supplemental report, in addition some friends of Lincoln
18 Park e-mails, you also were provided by my office
19 documents we received in response to a FOIA request
20 related to Lincoln Park?
21    A  Yes.
22    Q  Do you recall within that batch of documents
23 there was a Neighborhood Park Service report from the
24 Global Center for Prevention and Wellness at George
25 Washington University?

                FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                   D.C. Area 301-261-1902

Page 87

1     A  -- was.
2     Q  Did you review that report?
3     A  -- did.
4     Q  Please describe what was contained in that
5  report as related to the care maintenance being provided
6  at Lincoln Park.
7         MR. BARDO:  Objection.  The report speaks for
8  itself.
9         THE DEPONENT:  I was going to say, basically,
10 it just talked about the fact that they didn't have
11 enough funding to do adequate maintenance.
12        BY MR. VISCA:
13    Q  Is that the fact that there was lack of
14 resources to complete adequate maintenance in Lincoln
15 Park?  Was that consistent with everything else you've
16 reviewed and seen with respect to the condition of
17 Lincoln Park during the relevant timeframe?
18        MR. PARLER:  Objection.
19        BY MR. VISCA:
20    Q  So just give him a second to object.  Because
21 otherwise, your answer is going to get lost in their
22 objections.  Wait a beat.  But please repeat your answer
23 so we have a clear answer on the record.
24    A  Yes.
25    Q  Do you recall if that report mentioned specific

                FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                   D.C. Area 301-261-1902

Page 88

1  types of issues that were being -- that existed at
2  Lincoln Park that were part of the, the reason for the
3  lack of maintenance or overall good condition of the park
4  as detailed by the report?
5     A  Basically, the, the ongoing issues with the
6  presence of dogs in the park which frequently damaged the
7  grass areas.
8     Q  And is that issue consistent with what you
9  observed from the photos at OR around the time of the
10 incident with respect to the subject area?
11    A  Yes.
12    Q  In your professional opinion, what was
13 Violeta's responsibility with respect to the lawn-cutting
14 services being provided at Lincoln Park by its
15 subcontractor Davey back in 2021?
16        MR. PARLER:  Objection.  That question goes --
17 seeks an opinion beyond this gentleman's areas of
18 expertise.
19        MR. VISCA:  No, that's not, that's not true.
20 I'm asking him what Violeta, as a landscaping company's,
21 responsibilities were with respect to the lawn-cutting
22 services it was hired by the Park Service to provide in
23 2021?  He could, he could answer.
24        MR. PARLER:  Objection.
25        THE DEPONENT:  Okay.  Violeta had the contract

                FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                   D.C. Area 301-261-1902

Page 89

1  with the National Park Service.  They, in turn,
2  contracted with Davey Tree to do the mowing.  They still
3  had a responsibility to make sure that that practice was
4  getting performed properly.  They would still have an
5  obligation to make sure the reporting was getting done as
6  per contract specifications.  My wife's company,
7  Affiliated Grounds Maintenance Group, is, is a
8  subcontracted company.  It does -- it holds contracts,
9  then it subcontracts to work out to other contractors
10 around the country.  Currently, works in 39 different
11 states.  So we have to have account managers that go
12 inspect sites and oversee sites, and fill out detailed
13 reports on sites, especially during the winter.  So --
14        MR. PARLER:  Objection.
15        THE DEPONENT:  The common practice when you
16 subcontract work out is you still have an obligation to
17 oversee the work to make sure it's being maintained as
18 per the contract specifications.
19        MR. PARLER:  Objection.  Move to strike.  This
20 gentleman's neither a legal expert nor a contract expert,
21 and his anecdotal testimony about his wife's contract is
22 irrelevant.
23        MR. BOURY:  Go ahead.
24        BY MR. VISCA:
25    Q  Sir, the opinions you just explained, is that

                FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                   D.C. Area 301-261-1902

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                   2/14/2025

## Page 90

1  consistent with what the owner of Violeta testified to,
2  Ms. Sheila Wright, during her own deposition?
3          MR. PARLER:  Objection.
4          THE DEPONENT:  Yes.
5          MR. PARLER:  That misstates the, the record.
6  She was talking about the teaming agreement, Counsel.
7  There's no testimony regarding the Park Service contract.
8          MR. VISCA:  I have the February supplemental
9  report attached as exhibit one.  I'm going to attach the
10 1040, Ryals, 1047 photos batch as Exhibit 2.  And what
11 was the other one that started?
12         (Exhibit 2 was marked for identification.)
13         MR. PARLER:  Well, I think your questioning has
14 probably generated some additional questions.
15         MR. VISCA:  Sure.  I understand.  I'm just
16 about to finish up.  I just want to attach these for the
17 record.
18         And Exhibit 3 will be the, the photos starting
19 at Ryals's Bates 1033, that batch that we went through.
20         (Exhibit 3 was marked for identification.)
21 BY MR. VISCA:
22 Q   And lastly, sir, have all the opinions you
23 provided here today, as well as in your report within a
24 reasonable degree of professional certainty?
25 A   Yes.

                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

## Page 91

1          MR. VISCA:  All right.  I don't have anything
2  further at this time.  It sounds like the other attorneys
3  have some follow-ups for you.
4          RECROSS-EXAMINATION
5  BY MR. BARDO:
6  Q   Yes.  Mr. Arlington, would the -- we, we talked
7  about how the presence of grass in the, in the hole might
8  affect the, the depth of the hole.  Would the presence of
9  grass also affect the slope?
10 A   I guess it, it would depend on how the grass
11 grew.
12 Q   Now, you, you testified earlier that you, that
13 you thought that the -- based on the photo I showed you
14 with the grass removed, that that was a 90-degree -- was
15 slope the word you used?
16 A   Yeah.
17 Q   Yeah.  That it was a 90 -- you thought it may
18 have been close to a 90-degree slope, right?
19 A   Right.
20 Q   With the -- what do you estimate the slope to
21 be with, with the grass there?
22 A   I don't know.  I wouldn't have an answer to
23 that.
24 Q   You mentioned that the ground maintenance crew
25 should have carried, could and should have carried top

                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

## Page 92

1  soil to fill in holes, right?
2  A   They could have if that was requested by the
3  National Park Service, yes.
4  Q   But it is, is that -- is it -- is that
5  required by the national standards?
6  A   No.
7  Q   Should the -- to be more specific should the
8  National Park Service have requested the -- any grounds
9  crew to carry topsoil?
10 A   I think it would have been a beneficial
11 requirement if they would have because then Viola or
12 Davey Tree could have been fixing holes every week when
13 they came, and wouldn't have holes that persisted over
14 long periods of time.
15 Q   But the National Park Service not requiring --
16 the National Park Service's decision not to require that,
17 that is not a violation of the national standards?
18 A   It is not.
19 Q   That's it for me.
20         RECROSS-EXAMINATION
21 BY MR. BOURY:
22 Q   Mr. Arlington, grass generation, the pace of
23 grass generation or regeneration, I'm sorry, is affected
24 by weather, yes?
25 A   Yes.

                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

## Page 93

1  Q   And I believe you testified previously that
2  we don't know what the -- or you don't know what the
3  weather was in Washington, DC, in the area of Lincoln
4  Park for let's say two weeks before Plaintiff's incident;
5  is that fair to say?
6  A   Correct, yes.
7  Q   Can clover regenerate in 10 days or less?
8  A   Yes.
9  Q   Can grass achieve a point depending upon the
10 weather conditions in 10 days or less?
11 A   Depending on the weather conditions, yes.
12 Q   Would you agree with me that the, the hole as
13 depicted in the photographs that we were just looking at
14 from, 06/13 and, 06/20 of '21, that the hole in those
15 pictures was not observable even at a close distance?
16 A   Yes.
17 Q   And, again, you talked about the possibility of
18 the hole being dug by a dog, but we do know, we don't
19 know, isn't that correct, what the source of the hole was
20 ultimately?
21 A   Correct.
22 Q   And, again, we don't know how long it was
23 there, correct?
24 A   Prior to --
25 Q   I'm sorry.  Prior to the 10th or prior to 6/13

                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                    D.C. Area 301-261-1902

24 (Pages 90 to 93)

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                    2/14/2025

Page 94

```
1   or 6/20 of '21, correct?
2      A   Right?
3           MR. BOURY:  That's all I have.
4                   CROSS EXAMINATION
5        BY MR. PARLER:
6      Q   Sir, you testified you don't know the
7   difference between a subcontract agreement and an
8   assignment of a contract or contractual duties, correct?
9      A   Correct.
10     Q   And you don't know what the law is at the
11  District Of Columbia regarding the distinction between a
12  subcontract and an assignment of rights, correct?
13     A   Right.
14     Q   Was the Park Service aware as of June of 2020
15  that Davey's was going to be undertaking the lawn cutting
16  work under the contract with the Park Service?
17     A   Yes.
18     Q   And was Davey's submitting its own invoices for
19  payment under the contract for lawn cutting services
20  rendered at Lincoln Park and the other parks under the
21  Park Service contract?
22     A   Yes.
23          MR. BOURY:  Objection.  Objection.
24          BY MR. PARLER:
25     Q   I'm sorry, your answer was yes, sir?
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
                D.C. Area 301-261-1902
```

Page 95

```
1      A   Yes.
2           MR. PARLER:  Okay, No further questions.  Thank
3   you.
4           MR. VISCA:  I just want to clarify one thing
5   that Mr. Boury asked him.
6               FURTHER REDIRECT EXAMINATION
7        BY MR. VISCA:
8      Q   Mr. Arlington, Mr. Boury asked you there at the
9   end that you don't know how long that hole existed --
10  which basically -- correct me if I'm wrong.  That means
11  you don't know the actual amount of time, like, the, the
12  moment that hole got created prior to the date of
13  incident; is that correct?
14     A   Correct.
15     Q   Based on all of the information, records,
16  evidence, and your knowledge and expertise and experience
17  and within, again, within a reasonable degree of your
18  professional certainty, how long in your opinion had that
19  hole existed prior to the June 10th, 2021, date of
20  incident?
21          MR. BOURY:  Objection.
22          MR. PARLER:  Objection.  He said five times now
23  he doesn't know, counsel.  Come on.
24          MR. VISCA:  He did not.
25     Mr. BOURY:  It's beyond expert testimony.  It's
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
                D.C. Area 301-261-1902
```

Page 96

```
1   speculation now at this point.
2           MR. PARLER:  Yeah.  He's already -- he's
3   answered that multiple times.
4           MR. VISCA:  You guys keep asking the same things
5   over.  He's -- Mr. Arlington, please reiterate or
6   emphasize what your professional opinion is to how long
7   the hole existed prior to the date of incident.
8           MR. PARLER:  Objection.  Asked and answered.
9   And it calls for speculation.
10          Go ahead, sir.
11          THE DEPONENT:
                              I said it would have to be more
12  than a couple of weeks.  Even could be months based on
13  the amount of grass that had regrown into the hole.
14          MR. VISCA:  Thank you.
15          MR. PARLER:  Objection.  Move to strike as he
16  had said two minutes earlier he doesn't know how long the
17  hole was created before the the, the, before June 10th.
18          MR. VISCA:  Of course he doesn't know the
19  actual time frame.  He wasn't there.  He's using his
20  evidence to create an opinion as to the duration of the
21  hole existence.  You want to argue now, or you want to
22  argue with the judge?
23          MR. PARLER:  I'm not in an argument.
24          MR. VISCA:  Any further questions?
25          MR. BOURY:  Join in the objection.
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
                D.C. Area 301-261-1902
```

Page 97

```
1           THE DEPONENT:  Are we done?
2           MR. PARLER:  Yeah, I've got a question.  Let's
3   go back on.
4           Mr. Arlington, we took a long break before the
5   last part of your deposition.  Did you have any
6   conversations with anybody during that break?
7      A   I did.
8      Q   With whom?
9      A   My wife.
10     Q   Anyone else?
11     A   No.
12     Q   Did you receive any electronic text or e-mails,
13  regarding any of the issues in this case during the
14  break?
15     A   No.
16          MR. PARLER:  That's all I have.  Thanks.
17          MR. VISCA:  Nice try, Parler.  We'll read.
18          MR. PARLER:  Okay.
19          THE DEPONENT:  Are we done?
20          COURT REPORTER:  Yeah, is that -- are we off
21  the record, Mr. Bardo?
22
23          MR. BARDO:  Yes.  We're off the record.  I
24  think we're finished.
25          COURT REPORTER:  Okay.  We are off the record
    at 1:19.
              FREE STATE REPORTING, INC.
              Court Reporting  Transcription
                D.C. Area 301-261-1902
```

25 (Pages 94 to 97)

Free State Reporting, Inc.

6af96a6b-cbef-47e0-8b7b-4b95e5d3f1bd

Richard Arlington                    2/14/2025

|  | Page 98 |
|---|---|

```
 1          (Signature having not been waived, the
 2   deposition of RICHARD DANA ARLINGTON, III, was concluded
 3   at 1:19 p.m., on February 14, 2025.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                    FREE STATE REPORTING, INC.
                  Court Reporting  Transcription
                    D.C. Area 301-261-1902

|  | Page 99 |
|---|---|

```
 1
 2              C E R T I F I C A T E
 3        I, ROLAND THOMAS BOWMAN, III, court reporter
 4   and a Notary Public, do hereby certify that the foregoing
 5   witness, RICHARD DANA ARLINGTON, III, was duly sworn on
 6   the date indicated, and that the foregoing is a true and
 7   accurate transcription of the court reporter's electronic
 8   recording, and is a true record of the testimony given by
 9   the foregoing witness.
10        I further certify that I am not employed by or
11   related to any party to this action by blood or marriage,
12   and that I am in no way interested in the outcome of this
13   matter.
14        In witness whereof, I have hereunto set my hand
15   this 22nd day of February, 2025.
16
17
                 _____
18                   Roland Thomas Bowman, III, Reporter

                   Notary Public in and for the
                   State of Maryland
19
20   My commission expires:
21   November 15, 2026
22
23
24
25
```

                    FREE STATE REPORTING, INC.
                  Court Reporting  Transcription
                    D.C. Area 301-261-1902
                  Balt. & Annap. 410-974-0947

Free State Reporting, Inc.